Paul B. Salvaty (State Bar No. 171507)
Email: psalvaty@cohen-williams.com
Marc S. Williams (State Bar No. 198913)
Email: mwilliams@cohen-williams.com
COHEN WILLIAMS LLP
724 South Spring Street, 9th Floor
Los Angeles, CA 90014
Telephone: (213) 232-5160
Facsimile: (213) 232-5167

Attorneys for PLAINTIFF
TROY TAYLOR

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

TROY TAYLOR,

        Plaintiff,

    v.

ESPN INC., and XUAN THAI,

        Defendants.

Case No.

**COMPLAINT FOR DAMAGES FOR DEFAMATION**

**DEMAND FOR JURY TRIAL**

Plaintiff Troy Taylor ("Taylor"), for his claims against Defendants ESPN Inc. ("ESPN") and Xuan Thai ("Thai") (collectively, "Defendants"), alleges as follows:

### INTRODUCTION

1.      Taylor is the former head football coach for Stanford University.  He brings this action for defamation against ESPN and Thai because they made, published, and repeated defamatory statements about Taylor, knowing full well that the statements were false, for the purpose of smearing Taylor's reputation and injuring him in his profession.

2.      On or about March 19, 2025, ESPN and Thai published an article stating that two separate investigations had found that Taylor "bullied" and "belittled" female Stanford athletics staffers, that "the investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks," and that "[b]oth investigations determined that Taylor's treatment of employees, particularly of women, was inconsistent with Stanford's standards."  These statements were false, and ESPN and Thai knew them to be false at the time they were made.

3.      The false statements were then used by another ESPN reporter in an article that expressly sought to pressure Stanford Football General Manager, Andrew Luck, to terminate Taylor from his head coaching position.  Although Luck initially expressed support for Taylor to remain on the job, Defendants' false reporting ultimately achieved the desired result.  On March 25, 2025, ESPN and Thai reported that "Stanford fired football coach Troy Taylor," noting with self-satisfaction that Stanford's decision came a week after ESPN's initial reporting.  When announcing the decision to fire Taylor, Luck himself implicitly attributed the decision to Defendants, stating that, "in recent days, there has been significant attention to Stanford investigations in previous years related to Coach Taylor."

4.      Defendants failed to retract their inaccurate statements or take steps to correct the record even after being notified that their reporting was inaccurate and had unfairly tarnished Taylor's reputation.  To the contrary, Defendants doubled down, repeating their false claim in a subsequent article that "two outside firms had found Taylor bullied and

COHEN WILLIAMS LLP

belittled female athletic staffers," and twice claiming falsely that the "investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks."

5.     It was not until nearly three weeks after Taylor's firing that Defendants finally—and grudgingly—acknowledged key facts that contradicted their earlier reporting, but their belated concessions (which were made without any retraction and alongside more false statements) did more harm than good and, regardless, by then the damage to Taylor's reputation had been done.  On April 16, 2025, Defendants reported that the first investigation of Taylor "was initially launched" not in response to complaints by "multiple employees" but "in response to a single complainant who alleged gender bias and 'a culture problem in football.'"  Defendants also admitted that, despite interviews with "at least 20 Stanford athletic department staffers," the first investigator found "'insufficient evidence' regarding the original complaint."  In other words, contrary to Defendants' reporting, the investigations of Taylor began after a single athletic department employee made a single complaint; and the investigator found that no gender-based "bullying," "belittling," or unlawful discrimination had occurred.  Defendants nonetheless reported in that same April 16, 2025 article that "allegations regarding belittling . . . behavior toward . . . women were deemed to have merit" by the first investigator, which is not true.

6.     Defendants' false reporting about Taylor was not caused by negligence and did not result from any honest or good faith mistakes.  Rather, Defendants intentionally twisted the facts to advance a particular narrative and made (and repeated) patently false statements about Taylor for the purpose of harming his reputation and pressuring Stanford to fire him.  Defendants' pressure campaign against Taylor succeeded, and the resulting harm to his reputation has been severe and profound.  Accordingly, Taylor brings this lawsuit to hold Defendants accountable for their wrongful actions and to deter them from engaging in such malicious conduct in the future.

**JURISDICTION AND VENUE**

7.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332.

8.     The parties are of diverse citizenship.  Taylor is a citizen of the State of California and resides in Santa Clara County.  ESPN is a Delaware corporation with its principal place of business in the State of Connecticut.  On information and belief, Thai is a citizen of the State of Florida and resides in Del Ray Beach, Florida.

9.     The amount in controversy exceeds $75,000, exclusive of interest and costs.  Defendants' conduct has caused Taylor to suffer damages that exceed $75,000.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim alleged in this Complaint occurred in this district, the unlawful conduct by Defendants was directed to this district, and the harm to Taylor has been suffered in this district.

11.     Taylor is informed and believes and thereon alleges that Defendants intentionally directed their unlawful conduct to California and have therefore subjected themselves to jurisdiction in California.  At all relevant times, Taylor has been a citizen and resident of California.  He has suffered, and continues to suffer, from the severe impact of the defamatory statements in California.

**PARTIES**

12.     Taylor is an individual and resident of the State of California.  Taylor was an employee of Stanford University from December 2022 until he was terminated on March 25, 2025.

13.     ESPN's principal place of business is located at 935 Middle Street, ESPN Plaza, Bristol, Connecticut 06010.  According to ESPN's website, ESPN is "the world's leading multiplatform sports entertainment brand, features seven U.S. television networks, the leading sports app, direct-to-consumer ESPN+, leading social and digital platforms, ESPN.com, ESPN Audio, endeavors on every continent around the world, and more."  ESPN is 80 percent owned by ABC, Inc. (an indirect subsidiary of The Walt Disney

Company) and 20 percent by Hearst. ESPN has approximately 3,600 employees at its Bristol headquarters, with approximately 5,400 employees worldwide.

14.    Thai is a reporter and agent of ESPN. On information and belief, Thai joined ESPN in January 2023 as a senior writer and producer in the "ESPN Investigative and Enterprise Unit." She previously was deputy bureau chief of the south region for NBC News and, before that, held various positions covering politics, including as a show producer for MSNBC's *The Last Word with Lawrence O'Donnell*, *The Daily Rundown with Chuck Todd*, and *Andrea Mitchell Reports.*

## FACTUAL BACKGROUND

### A.    TAYLOR'S HARD-EARNED REPUTATION FOR INTEGRITY, INCLUSIVITY, AND SUCCESS ON AND OFF THE FOOTBALL FIELD

15.    On December 10, 2022, Taylor was named Stanford's Bradford M. Freeman Director of Football—Stanford's head football coach—because of his proven success on the field and because of his stellar reputation built over thirty years as a teacher, mentor, and leader.

16.    At the time of his hiring, Stanford's now-football General Manager Andrew Luck, a legendary quarterback who played for Stanford from 2009-2011, described Taylor as "a proven winner who loves coaching and developing his players on and off the field." Former Secretary of State Condoleezza Rice, who was on the hiring committee, stated: "Troy's track record as an innovative, winning football coach is remarkable and unique. . . . As we got to know him through the search process, it became apparent that his teams' success on the field has stemmed not only from his schematic brilliance but also from his genuine passion for educating and developing young men holistically." Likewise, Stanford's Director of Athletics Bernard Muir announced: "Troy is a proven winner who has experienced success at many levels of football." Muir explained: "Throughout our visits together he demonstrated an understanding of what makes Stanford special, and a deep desire to capitalize on our unique strengths. He possesses an incredible football mind and has a long history of caring deeply for the student-athletes he leads. I am excited for

the next chapter of Cardinal football and eager for our student-athletes to experience Troy's passion, wisdom and leadership."

17.     Taylor's success on and off the field made him a natural fit for Stanford. Taylor was a standout football player in high school and college.  At the University of California, Berkeley, Taylor was a starter for all four years, and his teammates selected him as a team captain and as the team's most valuable player for his last three seasons.  He is currently second on Cal's all-time leading passing list—which is impressive at a school that produced quarterbacks Aaron Rodgers, Jared Goff, Steve Bartkowski, and Kyle Boller, among others.

18.     After two years in the NFL, Taylor began his career as an educator and coach. He earned his California Teaching Credential and master's degree in cross-cultural education.  From 2002 through 2015, he held teaching and coaching jobs at Folsom High School.  Throughout his tenure at Folsom High, Taylor was a full-time teacher and named Educator of the Year in the Folsom/Cordova Unified School District in 2014.  In his last four years as coach, Taylor led the Folsom football program to a 58-3 overall record, won the Sac-Joaquin Section title all four seasons, and claimed the California Interscholastic Federation ("CIF") Division I state championship in 2014 by a score of 63-7.

19.     In addition to teaching and coaching, Taylor founded The Passing Academy— an elite quarterback training camp for high school athletes focused on developing and mentoring quarterbacks from ages 9 and up.  Many of the participants went on to earn full ride football scholarships at top notch universities, including several Division I schools.

20.     In 2016, Taylor returned to the college level, as a coach, where he continued to have success.  He first served as the offensive coordinator and quarterbacks coach at Eastern Washington University.  Eastern Washington University achieved a 12-2 overall record while advancing to the semifinals of the Football Championship Subdivision playoffs.  From 2017 to 2018, Taylor served as the offensive coordinator and quarterbacks coach at the University of Utah, where he helped the team reach its first Pac-12 South Division title in program history.

21.     These achievements brought Taylor to his first college-level head coaching job at Sacramento State University, where he also served as the offensive coordinator from 2019 to 2022.  Taylor inherited a program that had three two-win seasons in the prior four years and had never won a Big Sky Conference championship in the university's history.  Under Taylor's leadership, the program won the conference championship every year and only lost one conference game in his three-season tenure.  He was named the conference coach of the year all three seasons; his overall 30-8 record is the highest winning percentage in school history by far; and his 23-1 record in Big Sky Conference games is the highest winning percentage (96%) in Big Sky Conference history.  During his brief tenure, Taylor was named the Eddie Robinson FCS National Coach of the Year, the first and only time in school history that this prestigious award was bestowed upon a Sacramento State head football coach.

22.     At Sacramento State, Taylor created an "Honorary Captain" program that highlighted achievements and individuals in the community.  The Honorary Captain would speak to the football team the night before games and walk out to the pregame coin flip with the team captains for Sacramento State.  Multiple women were chosen to be Honorary Captains by Taylor.  A few notable mentions include Alyssa Nakken, a professional baseball coach for the San Francisco Giants and now Cleveland Guardians and the first woman to serve as a full-time coach in Major League Baseball history; Jessica Shults, an All-American catcher and former NCAA national champion in softball at the University of Oklahoma; and Erin Shelby, a human resources and culture consultant.

23.     In his personal life, Taylor is a highly involved family man, devoted to his wife of 27 years and his three children.  He has continually encouraged his two sons and daughter to live a life of integrity and treat all people with dignity, respect, and the love that they deserve, and to reject stereotypes, including but not limited to those based on gender.  Before starting at Stanford, Taylor had never been the subject of any complaint or investigation concerning his treatment of women or any member of his coaching staff.

24.     Taylor brought his long-held values of respect and inclusivity to Stanford when he started.  Despite losing 13 starters to the transfer portal upon his arrival, Taylor kept the team together by his focus on love, mindfulness, gratitude, and competitiveness. He has always coached primarily for love of the game and love of his players.  For all the time he spent as a high school coach (over 14 years), he never earned more than $3,200 a year coaching.  As he has said publicly: "I coach because I love it.  I love helping players fulfil their potential and seeing them come together as a team.  I have found that this helps build the foundation for future success in their life."  This is who Stanford hired in December 2022 to lead its football team, and this is who Taylor always has been and is today.

**B.    DEFENDANTS' FALSE REPORTING AND PRESSURE CAMPAIGN LEADS TO TAYLOR'S FIRING**

25.     After building a reputation for integrity and success over a thirty-year career, Defendants helped to destroy Taylor's good name and his football coaching career in a matter of days; and they did so by intentionally misstating facts that they had in their possession but chose consciously to twist and distort.

26.     On March 19, 2025, Defendants published a false and defamatory article about Taylor on ESPN.com titled "**Reports find Stanford's Taylor bullied, belittled female staffers**."  Ex. A (emphasis in original).  The focus of the March 19 article—which was clearly a hit-piece—was the confidential findings from two separate workplace investigations at Stanford conducted in 2023 and 2024.  The two workplace investigations had been completed approximately fifteen months and eight months, respectively, before the March 19 article was published, and both Stanford and Taylor had acknowledged the results of the investigations and moved on.  Nevertheless, in or around March 2025, someone with access to Taylor's "confidential" personnel file and to the "confidential" investigatory reports themselves apparently decided to improperly leak the materials to Defendants.  Defendants not only reported the allegations against Taylor contained in the leaked documents in a misleading and sensationalized manner but also falsely reported the

investigatory findings themselves and then used their false reporting to pressure Stanford to fire Taylor from his job.

### 1. Facts Concerning the First and Second Investigations

27.     To date, Taylor has been provided with incomplete information about the workplace investigations that were the subject of Defendants' reporting, although he has been able to obtain more details about the first investigation than about the second.

28.     The first investigation began in or around May 2023, just a few months after Taylor was hired at Stanford and well before his first season got underway ("First Investigation").  At that time, Stanford engaged an external reviewer, Kate Weaver Patterson, "to assess the culture of the football program and conduct a review of various allegations related to whether DAPER employees are mistreated or disrespected in general and/or due to gender."[1]  Taylor has had limited visibility into the precise nature of the allegations at issue in the First Investigation, but it is known that the original complaint that led to the First Investigation was that Taylor had requested to replace the "football administrator" based on her gender.  Taylor has never to this day been provided with a complete copy of the First Investigation's investigatory findings, but he was provided with a summary of the findings in December 2023.  According to that summary, the First Investigation concluded that there was "insufficient evidence" to find that Taylor had requested to replace the football administrator based on her gender.  There was no finding in the First Investigation that Taylor had "bullied" or "belittled" female staffers or that Taylor had engaged in any "hostile" or "aggressive behavior" targeted at women.

29.     Although Stanford's Director of Athletics, Bernard Muir, gave Taylor a written warning after the First Investigation due primarily to Taylor's "communication style," Muir also stated:

> "I would like to note that the investigator also found that there have been improvements in your communication style and that you exhibit a willingness

---

[1] "DAPER" stands for Department of Athletics, Physical Education and Recreation.

to learn and grow. I very much appreciate your openness and cooperation throughout this holistic review of our football program, as well as your demonstrated commitment to adjust your behavior accordingly. Troy, as the Head Football Coach you have made important contributions to our program in your short time at Stanford, and I look forward to that continuing in the future."

30. Following the First Investigation, Stanford communicated to Taylor that they were happy with his job performance and that they wanted him to remain as Stanford's head football coach for many years. In early 2024, when Stanford learned that Taylor was being seriously considered to replace UCLA's recently-departed football coach, Chip Kelly, Stanford took steps to ensure that Taylor would remain at Stanford and would not pursue the job at UCLA. By letter dated February 29, 2024, which was signed on March 8, 2024, Stanford agreed to extend the term of Taylor's appointment as head coach and to increase both the amount of Taylor's annual base salary and the amount of any buy-out in the event that his employment contract was terminated early.

31. It was around this same time that Stanford launched the second workplace investigation. In or about March 2024, Stanford received a complaint from a compliance officer regarding Taylor. The complaint followed a discussion between Taylor and the compliance officer about the physical speed at which Stanford players could participate in a "walk-through." A walk-through is a practice session where players go through plays at a slow, non-contact pace to help them solidify their understanding of assignments and game strategies. Although it is common in walk-throughs for players, at times, to jog, the compliance officer had taken the position that walking was required and that no jogging was allowed. During their conversation, Taylor expressed frustration that the compliance officer was interpreting NCAA rules in an overly restrictive way that was not required by the rules themselves. From Taylor's perspective, the conversation was direct, but entirely professional and not particularly heated. Two witnesses—one male and one female—were

COMPLAINT FOR DAMAGES FOR DEFAMATION

present during the discussion, and both witnesses stated at the time that Taylor's handling of the conversation with the compliance officer was appropriate.

32. Nevertheless, after Stanford engaged a separate investigator, Timothy O'Brien, to investigate this incident ("Second Investigation"), the investigator made findings against Taylor. As with the First Investigation, Taylor has never to this day been provided with a copy of the Second Investigation's investigatory report, even though Defendants apparently have a copy in their possession and Taylor has asked that it be provided to him.[2] Taylor contested the findings as summarized for him, but ultimately agreed to what he considered to be modest conditions for the good of the program, including forfeiting an agreed upon raise for twelve months, issuing a non-public apology, and changing his tone.

33. While certain details concerning the First and Second Investigations have been withheld from Taylor and he has not been provided with complete copies of either investigatory report, there are certain facts about the findings that are beyond dispute. Most importantly, it is undisputed that the First Investigation did <u>not</u> find and did <u>not</u> conclude that Taylor "bullied" or "belittled" female staffers based on their gender. In fact, the lead finding of the First Investigation was that the original complaint, that Taylor had "requested" to replace the football administrator based on her gender, was not substantiated. The football administrator was someone who Stanford placed in the position shortly after Taylor started at Stanford. The football administrator position is akin to the head coach's "right hand," and Taylor had wanted to replace the football administrator with his own chosen person. Ultimately, this individual was not replaced, and no adverse personnel decision ever occurred. Not surprisingly, the first investigator concluded: "There

---

[2] In response to Taylor's request to produce to him the two investigatory reports that had been leaked to ESPN and that had been the subject of their reporting, ESPN "respectfully declined," claiming that, "like many news organizations, as a matter of policy ESPN does not share unpublished information." This response is both ironic and absurd, given that ESPN is responsible for having published this otherwise-unpublished information in its reporting, albeit in a false, misleading, and distorted manner.

1  is insufficient evidence to find that gender was the reason for your request to replace the
2  football administrator."  In addition, there were no findings in the First Investigation to
3  suggest that Taylor targeted women with "bullying" or "belittling" statements or conduct.
4  Defendants' repeated reporting to the contrary is simply untrue.

### 2. Defendants' False Reporting about the Investigative Findings

6  34.    After Defendants received the leaked materials from their anonymous source,
7  they proceeded to publish a series of articles that contained false statements about the
8  investigatory findings and to use their false reporting to publicly pressure Stanford to fire
9  Taylor from his job.

10  35.    As noted, Defendants began their coverage in a March 19, 2025 article under
11  a false headline: "**Reports find Stanford's Taylor bullied, belittled female staffers**."
12  This headline was false because, at the very least, the First Investigation's report
13  indisputably did not find that Taylor "bullied" or "belittled" female staffers and, on
14  information and belief, the Second Investigation's report did not make that finding either.
15  The March 19 article also falsely stated: "*Both investigations determined that Taylor's*
16  *treatment of employees, particularly of women, was inconsistent with Stanford's*
17  *standards.*"  Ex. A (italics added).  This statement was false because "both investigations"
18  did not make this determination.  In addition, the March 19 article falsely stated: "*The*
19  *investigations began after multiple employees filed complaints against Taylor for what they*
20  *called hostile and aggressive behavior, as well as personal attacks.*"  Ex. A (italics added).
21  In reality, the first investigation began after a single complaint by a single individual that
22  Taylor wanted to replace the football administrator because she is a woman.  The first
23  investigator then concluded there was "insufficient evidence to find that gender was the
24  reason for your request to replace the football administrator."

25  36.    To amplify their false reporting and maximize its salacious and detrimental
26  effect, Defendants organized the March 19 article in a fundamentally misleading manner,
27  pulling snippets of the First Investigation report and mixing them with snippets of the
28  Second Investigation report, all without providing proper context.  Defendants also

included in their reporting anonymous personal attacks on Taylor's character, particularly with respect to his allegedly "hostile" and "aggressive" treatment of women. For example, even though the First Investigation did not substantiate gender-based "bullying" or "belittling" by Taylor, the March 19 article quoted an anonymous source "who spoke with ESPN on condition of anonymity" as saying, "while Taylor is an 'equal opportunity a-- hole,' his behavior more often targeted women." Ex. A. The true facts surrounding the two investigations were not sufficient to support the narrative that Defendants wanted to advance; so, they made a conscious decision to misstate the facts and added gratuitous and anonymous smears that made Taylor look worse, particularly with respect to his treatment of women.

37. Thai also posted the March 19 article to her personal Instagram page. Ex. B. Thai's Instagram post, which remains publicly accessible today, prominently features the article's false and defamatory headline and opening paragraph without any context at all. It also includes a photo of Taylor that contains the following false statement: "*Stanford head coach Troy Taylor remains on the job after two investigations found he had bullied and belittled athletics staff, especially women, and made inappropriate comments about one woman's appearance.*" Ex. B (italics added). Defendants' initial reporting gave the unmistakable and false impression that Taylor had engaged in widespread bullying and belittling of female staff, that numerous complaints against Taylor had been made to that effect, and that two separate investigations by two different investigators had made findings that Taylor "targeted" multiple women with hostile, aggressive, and discriminatory conduct.

38. The March 19 article spread across mainstream media almost immediately, including articles published by The New York Times, CBS Sports, AP News, and many others, all citing ESPN's report of the leaked personnel materials obtained by Thai. Much of the coverage focused specifically on Defendants' false reporting that two investigations had "found" Taylor to have "bullied" female staffers, thereby amplifying Defendants' most egregious misstatements and generating a viral internet pile-on that went global within a

few hours.  For example, the New York Times reported the story under the headline: "**Stanford's Troy Taylor found in 2 investigations to have bullied female staffers: Report**."  Ex. C (emphasis in original).  Under a photograph of Taylor, the New York Times repeated almost verbatim the false narrative that Defendants had created:

> "Stanford football coach Troy Taylor mistreated female staff members and tried to have an NCAA compliance officer removed after she raised concerns over rules violations, according to a report from ESPN.
>
> ESPN obtained documents from two investigations into Taylor's behavior, where more than 20 former and current Stanford athletics staffers cooperated with investigators.  The investigations began after multiple employees filed complaints against Taylor for 'aggressive and hostile behavior,' ESPN reports.
>
> Both investigations determined that Taylor's treatment of employees, particularly women, was inconsistent with Stanford's standards, per ESPN."

Ex. C.  Similarly, CBS Sports reported the story under the headline, "**Investigations find Stanford's Troy Taylor bullied, used 'discriminatory' behavior towards female staffers**," and, in the opening paragraph, stated: "A pair of investigations found Stanford coach Troy Taylor mistreated female staffers and tried to have an NCAA compliance officer removed after being warned of rule violations, according to documents obtained by ESPN."  Ex. D (emphasis in original).  These articles, and many others, include links to the March 19 article published by Defendants.

39.    On March 22, 2025, ESPN published a second false and defamatory article about Taylor on ESPN.com, this time from ESPN reporter Dan Wetzel.  Ex. E.  In the article, titled "**Wetzel: Bad behavior is on Stanford coach Taylor, but this is Andrew Luck's program**" (emphasis in original), Wetzel included additional anonymous smears about Taylor (which apparently were relayed to him by Thai), all of which supported Defendants' false narrative that Taylor was a misogynistic bully who had been the subject of many complaints and who had been found by two investigators in two separate investigations to have engaged in widespread gender-based "bullying."

COHEN WILLIAMS LLP

40.    In the March 22 article, which reads like something from the *National Enquirer,* ESPN and Wetzel reported that "*multiple sources who spoke on the condition of anonymity told ESPN's Thai that Taylor's behavior extended beyond staffers and compliance officers to people within the coaching staff. One source said Taylor 'has lost the locker room.'*" Ex. E (italics added). There are no facts to indicate that the anonymous source who spoke to Thai had personal knowledge to support these assertions. ESPN and Wetzel also speculated that Taylor's "future would be tenuous even if he hadn't, per two separate Stanford investigations uncovered by ESPN, been accused of bullying and belittling female athletic staffers, seeking to have an NCAA compliance officer removed after she warned him of rules violations and repeatedly making 'inappropriate' comments to another woman about her appearance." Ex. E. This is a nonsensical assertion given that Stanford had only recently given Taylor a contract extension and a significant raise to ensure he remained at Stanford for years to come. In a gossipy reporting style, ESPN and Wetzel added, "It's somewhat of a mystery exactly why he remained on the job—this is Stanford, after all, or at least is supposed to be. The NCAA violations were fairly minor, but that's all the more reason not to fight them. The attitude displayed to compliance is a red flag of its own. Again, Stanford." Ex. E. Wetzel also mocked Taylor's public commitment to use the investigations as a learning opportunity, stating: "Here's hoping he's successful in that endeavor, if only for everyone else's sake." Ex. E.

41.    After purporting to "just ask questions" about how Stanford could keep Taylor on the job after the allegedly adverse findings about his treatment of female staff in two separate investigations, the March 22 article concluded with a not-at-all-subtle attempt to pressure Stanford's General Manager, Andrew Luck, to fire Taylor for the good of the school, its reputation, and its football program:

> "The questions go on. The answers, thus far, are nowhere to be found.
>
> Right now, all of Stanford's trust is in Luck, and for good reason. He has earned that. He has earned the chance to run this program through uncertain, even potentially dire, times in the ever-shifting landscape of college athletics.

It's his program now, and that means Troy Taylor is his coach; everything reflecting back on not just the school but on the all-time great in charge via a new-age job."

Ex. E.

42.    By letter dated March 25, 2025, Taylor notified Defendants that their reporting about him had been inaccurate and unfair. Taylor requested, among other things, that Defendants refrain from publishing more articles based on the investigations, at least without giving Taylor an opportunity to engage in a good faith discussion with Defendants about the accuracy of their claims. No one at ESPN responded to this letter. Nor did ESPN or Thai take any steps to retract or correct their prior false reporting.

43.    On that same day, March 25, 2025, Stanford announced that it was terminating Taylor's contract and replacing him as Stanford's head football coach. In his public statements, Luck implicitly attributed the decision to Defendants' false reporting. In the wake of the media storm generated by Defendants' March 19 article, Luck had stated that he stood by Taylor and would keep him on as Stanford's head football coach. But after Defendants' sustained attack on Taylor's reputation, Luck apparently changed his mind, noting that, after careful consideration and consultation with university leadership, he had decided that Stanford's football program needed a "reset." In his public comments, Luck explicitly attributed his change of heart to the reporting: "[I]n recent days, there has been significant attention to Stanford investigations in previous years related to Coach Taylor." Ex. F. In other words, it was Defendants' false reporting of the investigatory findings, more than the findings themselves, that led to Taylor's firing.

44.    On March 25, 2025, Defendants ESPN and Thai along with another ESPN reporter, Kyle Bonagura, published a third defamatory article about Taylor on ESPN.com, repeating their prior false statements about the investigatory findings and taking credit for Taylor's firing:

"Stanford fired football coach Troy Taylor, the school announced Tuesday. The decision comes a week after ESPN reported that two outside firms had

found Taylor bullied and belittled female athletic staffers, sought to have an NCAA compliance officer removed after she warned him of rules violations and repeatedly made 'inappropriate' comments to another woman about her appearance."

Ex. F.  They also repeated their false claim that "the investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks, the reports said."  And they repeated their anonymous smears that Taylor "has 'lost the locker room,'" and that "Taylor's behavior extended beyond athletic department and compliance office staff and onto the field."  *Id.*

45.    On April 16, 2025, Taylor issued a public statement to try to rebut the false narrative that Defendants had created and to explain the actual facts surrounding the two workplace investigations that had been mischaracterized by Defendants.  At the very least, Taylor hoped to present his side of the story, which had not been included in Defendants' inaccurate reporting that led to his firing.

46.    Rather than covering Taylor's public statement in an honest way, Defendants used it to double down on their prior reporting and to make more false statements.  On April 16, 2025, Defendants published a fourth defamatory article on ESPN.com, titled "**Ex-Stanford coach Troy Taylor takes issue with investigation.**"  Ex. G (emphasis in original).   Although Defendants reported that Taylor "did not acknowledge any wrongdoing," they added that Taylor "had not obtained the text of the two investigation reports" that had been leaked to Defendants.  In this way, Defendants sought to elevate the credibility of their false reporting over the credibility of Taylor's denials.

47.    For the first time, in the April 16 article, Defendants acknowledged details that refuted some of their earlier false claims including admitting that the First Investigation "was initially launched in response to a single complainant who alleged gender bias and 'a culture problem in football,'" and that the First Investigation "did find 'insufficient evidence' regarding the original complaint."   But Defendants also added another defamatory statement, claiming falsely that, "Three of the allegations [in the First

Investigation] regarding belittling and inappropriate behavior toward multiple women were deemed to have merit." Ex. G. This statement is false because, again, the First Investigation's investigatory findings did not include any finding that Taylor had discriminated against even one female staff member, let alone "multiple women." The April 16 article is another example of Defendants intentionally misstating facts to advance their false narrative about Taylor, without any regard for the harm they were inflicting on his reputation.

48.    By letter dated April 17, 2025, Taylor notified Defendants that their reporting about him included numerous false and defamatory statements that were causing real and substantial harm to him and his reputation. Taylor also requested that Defendants retract their false reporting to stop further harm and to allow Taylor to address prior harm. By letter dated May 8, 2025, ESPN finally and belatedly responded, declining to retract any of the articles and stating that it "fully stands by both the accuracy and propriety of its reporting."

49.    Defendants' refusal to admit that their reporting was false and defamatory, as well as their refusal to take any steps to correct the misimpressions created by their wrongful conduct, necessitated this action.

## FIRST CLAIM FOR RELIEF

### (Defamation)

### (Against All Defendants)

50.    Taylor incorporates herein by this reference the allegations in all preceding paragraphs.

51.    Taylor is a private citizen, (formerly) employed by a private entity. The First and Second investigations discussed in Defendants' series of articles about him addressed private matters relating to his employment. The materials that Defendants purported to describe in their defamatory articles included privileged and confidential materials from Taylor's personnel file as well as privileged and confidential materials that, to this day, have never been shared with Taylor due their allegedly sensitive and confidential nature.

In their reporting, Defendants exploited private information, some of which Taylor has never seen or been given an opportunity to refute, for the purpose of portraying him as a misogynistic bully who had engaged in widespread gender-based discrimination, and to limit his ability to rebut, correct, or meaningfully respond to Defendants' false charges through his own public statements. Defendants also took information from the investigatory files out of context and combined anonymous smears with facts to create a national media story about Taylor that was fundamentally false, misleading, and unfair.

52. On March 19, 2025, ESPN published an article by Thai on ESPN.com under a headline that falsely stated, "**Reports find Stanford's Taylor bullied, belittled female staffers**." Ex. A (emphasis in original). In addition to this false headline, the article prominently featured a photograph of Taylor with a caption that falsely stated, "*Stanford head coach Troy Taylor remains on the job after two investigations found he had bullied and belittled athletics staff, especially women, and made inappropriate comments about one woman's appearance.*" Ex. A (italics added). In the March 19 article itself, Defendants made the following additional false statements:

    a. "*Stanford head football coach Troy Taylor bullied and belittled female athletic staffers, sought to have an NCAA compliance officer removed after she warned him of rules violations and repeatedly made 'inappropriate' comments to another woman about her appearance, according to documents from a pair of investigations obtained by ESPN.*"

    b. "*The investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks, the reports said.*"

    c. "*Both investigations determined that Taylor's treatment of employees, particularly of women, was inconsistent with Stanford's standards.*"

Ex. A (italics added).

53. Defendant Thai posted the March 19 article to her personal Instagram page. Ex. B. This post, which remains publicly accessible today, prominently features the

COHEN WILLIAMS LLP

article's false and defamatory headline, "**Reports find Stanford's Taylor bullied, belittled female staffers**" (emphasis in original), along with the photograph of Taylor over a false and defamatory caption, stating: "*Stanford head coach Troy Taylor remains on the job after two investigations found he had bullied and belittled athletics staff, especially women, and made inappropriate comments about one woman's appearance.*" (Italics added).

54.    On March 22, 2025, ESPN published an article by Dan Wetzel on ESPN.com titled: "**Wetzel: Bad behavior is on Stanford coach Taylor, but this is Andrew Luck's program**." Ex. E (emphasis in original). In this article, ESPN implied that the false statements about Taylor in the March 19 article were, in fact, true and that those false statements were consistent with the findings contained in the First and Second Investigation's investigatory reports. In the March 22 article, ESPN and Wetzel also juxtaposed Defendants' prior reporting with anonymous smears and other misleading statements to create a false impression about Taylor, and then they used the false impression created by their own reporting to pressure Stanford, particularly Luck, to fire Taylor from his head coaching position.

55.    On March 25, 2025, ESPN published an article by Thai and Kyle Bonagura on ESPN.com titled, "**Stanford football needs 'reset,' fires football coach Troy Taylor**." Ex. F (emphasis in original). This March 25 article contained additional false statements including:

  a.  "*Stanford fired football coach Troy Taylor, the school announced Tuesday. The decision comes a week after ESPN reported that two outside firms had found Taylor bullied and belittled female athletic staffers, sought to have an NCAA compliance officer removed after she warned him of rules violations and repeatedly made 'inappropriate' comments to another woman about her appearance.*"

b.  "*According to documents obtained by ESPN, the investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks, the reports said.*"  Ex. F (italics added).

56.    On April 16, 2025, ESPN published an article by Thai titled, "***Ex-Stanford coach Troy Taylor takes issue with investigation***."  Ex. G (emphasis in original).  In this article, Defendants admitted facts that contradicted their prior reporting by stating that the First Investigation "was initially launched in response to a single complainant who alleged gender bias and 'a culture problem in football,'" and that the first "investigator did find 'insufficient evidence' regarding the original complaint."  Ex. G.  However, Defendants did not retract their prior misstatements or make clear that their prior reporting had been inaccurate.  Furthermore, Defendants made additional false statements about Taylor including that, "*Three of the allegations regarding belittling and inappropriate behavior toward multiple women were deemed to have merit*."  Ex. G (italics added).  They also repeated their prior false statement that, "*The investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks, the reports said*."  Ex. G (italics added).

57.    The statements made by Defendants about Taylor in their March 19, 22, 25, and April 16 reporting (as well as Thai's social media post), which have been published, republished, and repeated by Defendants, were false because, among other things, the First Investigation did <u>not</u> determine that Taylor engaged in gender-based bullying or belittling; there were <u>not</u> "two investigations" that found that Taylor "had bullied and belittled athletics staff, especially women;" the workplace investigations did <u>not</u> begin after "multiple employees filed complaints" against Taylor for "hostile and aggressive behavior" toward female employees or staff; and there was <u>no</u> finding after the First Investigation that "allegations regarding belittling . . . behavior toward . . . women were deemed to have merit."  As Defendants ultimately conceded (albeit in grudging and misleading manner), the lead finding of the First Investigation—which began after a single complaint by a single

staff member—was that there was "insufficient evidence to find that gender was the reason for your request to replace the football administrator."

58.     In addition to these false statements, there are numerous other statements in Defendants' March 19, 22, 25 and April 16 articles that are misleading because Defendants took them out of context and/or juxtaposed facts in a manner intended to imply a defamatory connection and to create a defamatory implication about Taylor.  The thrust of Defendants' reporting was that numerous complaints by multiple women had been made against Taylor and that many of these purported complaints had been determined by two different investigators in two separate investigations to have merit.   Defendants' misleading statements and insinuations included:  (1) statements that falsely insinuated that Taylor had "targeted" potentially dozens of women with aggressive, bullying, belittling, and discriminatory behavior; (2) statements that falsely suggested or implied that Taylor admitted to having engaged in gender-based "bullying" and "belittling" and other discriminatory conduct; and (3) statements that falsely suggested that, prior to March 25, 2025, Stanford had not expressed support for Taylor (when in fact it had done so repeatedly) and that Stanford had no explanation for having kept Taylor on the job after the Second Investigation.  Through this reporting, Defendants exaggerated and distorted both the nature of the allegations against Taylor and the investigatory findings, and they maximized the public pressure on Stanford to fire him from his job.

59.     Taylor is informed and believes that Defendants have taken steps to ensure that the defamatory statements about him have been continuously published from the date of their first publication to this day.  The full extent to which Defendants have published, distributed, marketed, and sold the defamatory statements about Taylor will be the subject of discovery in this case.

60.     Defendants specifically intended and reasonably understood that the false statements that they made were about Taylor.  Defendants identified Taylor by name, made clear that they were accusing Taylor of having been "determined" and "found" by two separate investigations to have engaged in widespread discriminatory conduct that targeted

COHEN WILLIAMS LLP

multiple women, and they continue to insist that their false allegations are entirely accurate and appropriate.

61.    Defendants' defamatory statements about Taylor constitute defamation per se because the statements are defamatory on their face, and nothing needs to be added or explained to make their defamatory meaning understood.  Moreover, the defamatory statements are defamatory per se because they explicitly and falsely charge Taylor with unethical, illegal, and discriminatory conduct.  Thus, general damages in favor of Taylor are presumed as a matter of law.

62.    Defendants knew that their statements about Taylor were false, had no basis to believe in their truth, acted in reckless disregard and/or had serious doubts about the truth of their statements, and made these statements with actual malice.  Defendants claim to have possession of the investigatory reports, which contradict their false reporting, particularly as to the First Investigation and potentially as to the Second Investigation as well.

63.    The evidence of actual malice with respect to Defendants' false reporting about Taylor is clear, convincing, and overwhelming.  Defendants' accusations against Taylor are, by Defendants' own admission, inherently improbable.  Defendants acknowledged the inherent improbability in their own reporting, expressing surprise that Stanford had not already fired Taylor for having been "found" in two separate investigations to have engaged in gender-based bullying of multiple women.  Nevertheless, Defendants repeatedly claimed and implied that the gender-based "bullying" behavior was widespread and that the two investigations found Taylor to have engaged in discriminatory conduct toward multiple women.

64.    Defendants' actual malice is also proven by the number of times that Defendants repeated their false statements in their reporting, despite having information in their possession that demonstrated the falsity of their claims and notwithstanding the fact that Taylor notified Defendants that their reporting was inaccurate and unfair.  Defendants not only exaggerated the facts; they repeatedly misstated them to create the false

impression that "multiple" reports had been made and that two separate investigations by two different investigators had found numerous instances of gender-based discrimination by Taylor. Examples of Defendants' misleading statements include their reporting that the investigatory reports identified "more than 20 former and current Stanford athletics staffers who cooperated with independent investigators," and that Patterson's alleged findings of gender-based "bullying" were based on "30 interviews over four months."

65. Similarly, Defendants' actual malice is proven by the fact that they used multiple anonymous sources to attempt to bolster their false allegations and to make them appear to be true, including gratuitous, gossipy, and disparaging comments about Taylor's character and conduct. For example, Defendants made the anonymous charge that Taylor "is an 'equal opportunity a--hole'" and that "his behavior more often targeted women." In two of their articles, Defendants also repeated the anonymous claim that "Taylor's behavior extended beyond" staffers and compliance officers and "onto the field" or "to people within the coaching staff," and that Taylor had "lost the locker room." Defendants also went to great lengths to organize the articles in a misleading way, juxtaposing true statements and snippets with false statements and mixing quotes from the investigatory reports in a manner that amplified the allegations and made them difficult to parse.

66. Defendants' actual malice also is proven by the manner in which they covered Taylor's public statements both before and after he was fired. In their March 19, 22, and 25 articles, Defendants reported Taylor's public statements in a manner that suggested that he did not dispute the findings, when in fact he has always contended that no discrimination had occurred. Similarly, in the April 16 article, Defendants attempted to discount Taylor's denials by pointing out that Taylor "had not obtained the text of the two investigation reports in which multiple complainants were quoted," whereas "ESPN obtained copies of both investigations and was first to report on the findings." In the April 16 article, Defendants also included false claims that undermined Taylor's post-firing attempts to clear his name, including that the reports found that "[t]hree of the allegations regarding belittling and inappropriate behavior toward multiple women were deemed to have merit"

and that, "[t]he investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks." Also, after speculating in their March 25 article that, "It is unclear whether the university will have to pay out the remainder of Taylor's contract," Defendants failed to acknowledge in their April 16 article that, in fact, Stanford would be paying out the remainder of Taylor's contract because Taylor was being terminated without cause. The facts were contained in Taylor's public statement: "The truth is that Stanford terminated me without cause and, as a result, is honoring the original payment terms of my contract." Yet Defendants chose not to reference those facts in their reporting because it would not have advanced the false story they wanted to tell.

67.    Defendants' actual malice also is proven by their failure to make any reasonable attempt to speak to Taylor or hear his side of the story before launching their media campaign against him. Thai did not reach out to Taylor until the same day that the March 19 article was published, and only did so by voicemail mere hours before the article went live on ESPN.com. Rather than making a good faith effort to speak to Taylor or waiting a reasonable amount of time for Taylor to return her call, Defendants published the March 19 article that same day as Thai's voicemail without speaking to him first. In other words, Defendants decided to publish false allegations about Taylor that were likely to destroy his career without providing a fair or even minimally meaningful opportunity for him to respond. There was no breaking news in the March 19 article, and no legitimate reason Defendants could not have held off on publication until they spoke to Taylor first. The central facts being reported in the March 19 article pertained to workplace investigations that had been completed many months earlier. Defendants' failure to speak to Taylor before rushing to publish their defamatory statements about him is further clear and convincing proof that they knew their reporting about him was false and/or that they were purposefully avoiding the truth.

68.    As a result of Defendants' wrongful conduct, Taylor has suffered severe injury to his ability to pursue his profession, including the loss of his job as Stanford's head

football coach and the inability subsequently to find employment in his chosen field. Defendants' false reporting was a substantial factor in causing Taylor to be fired, as demonstrated by Luck's public statements on the firing and by Defendants' own reporting taking credit for the termination. In addition, Taylor has suffered harm to his reputation and has suffered embarrassment, hatred, contempt, mortification, and shame. Defendants' conduct was a substantial factor in causing the damages, harm, and injuries to Taylor alleged herein, all in amounts according to proof and in excess of the jurisdictional minimum of this Court.

69.    Taylor is informed and believes and thereon alleges that the aforementioned acts of Defendants were willful, oppressive, fraudulent, and/or malicious. The conduct of Defendants in publishing these false statements about Taylor, with knowledge of their falsity, for the express purpose of harming Taylor was intentional and despicable. Taylor is therefore entitled to punitive damages.

## **JURY TRIAL DEMAND**

Taylor respectfully demands a jury trial in this action.

## **PRAYER FOR RELIEF**

WHEREFOR, Taylor prays for relief as follows:

A.    For damages to be proven at trial;

B.    For punitive damages to be proven at trial;

C.    For prejudgment interest;

D.    For an order awarding Taylor his reasonable attorneys' fees and costs; and

E.    For such other and further relief as this Court may deem to be just and proper.

Dated: July 30, 2025                **COHEN WILLIAMS LLP**


By: _____
    Paul B. Salvaty
    Marc S. Williams
    Attorneys for Plaintiff Troy Taylor

COMPLAINT FOR DAMAGES FOR DEFAMATION

# EXHIBIT A

# Reports find Stanford's Taylor bullied, belittled female staffers



Stanford head coach Troy Taylor remains on the job after two investigations found he had bullied and belittled athletics staff, especially women, and made inappropriate comments about one woman's appearance. AP Photo/Matt Kelley



**Xuan Thai**
Mar 19, 2025, 05:11 PM ET

  **Share**

Stanford head football coach Troy Taylor bullied and belittled female athletic staffers, sought to have an NCAA compliance officer removed after she warned him of rules violations and repeatedly made "inappropriate" comments to another woman about her appearance, according to documents from a pair of investigations obtained by ESPN.

After the first investigation, Taylor signed a warning letter on Feb. 14, 2024, acknowledging he could be fired if the conduct continued, according to the documents. Additional complaints were documented in a second investigation that ended last July 24, but Taylor remains on the job.

---

**EDITOR'S PICKS**

 **It wasn't his behavior, but this Stanford program belongs to Andrew Luck**
126dDan Wetzel

---

In a statement released by Stanford on Wednesday, Taylor said he was using the investigations to improve "how I interact with others."

"I willingly complied with the investigations, accepted the recommendations that came out of them, and used them as a learning opportunity to grow in leadership and how I interact with others," Taylor said in the statement. "I look forward to continuing to work collaboratively and collegially with my colleagues so that we can achieve success for our football program together."

In a separate statement, a university spokesperson said, "Stanford believes in upholding the highest standards of behavior in the workplace."

"The University received complaints regarding Coach Taylor and a third party investigated the matter thoroughly. Last summer, the University took appropriate measures, Coach Taylor received coaching, and he has committed to nurturing the respectful working environment that is essential to the success of all our athletics programs."

Athletic director Bernard Muir, who recently announced his intention to resign after the current academic year, declined to comment. Andrew Luck, hired last November as Stanford football's general manager, making him Taylor's boss, did not respond to a request for comment. Luck and Condoleezza Rice, the former U.S. secretary of state and onetime Stanford provost, served on the committee that hired Taylor in December 2022.

Matt Doyle, senior associate athletics director, also received a warning after the first investigation cited him for inappropriate conduct. He told ESPN in a statement: "In the summer of 2023, some issues surrounding my performance were brought to my attention. I took those concerns very seriously and have worked diligently on implementing feedback received from that process to support a successful and positive culture."

The investigation reports obtained by ESPN are marked "privileged and confidential" and identify more than 20 former and current Stanford athletics staffers who cooperated with

independent investigators.

ESPN is not identifying anyone who participated in the investigation, some of whom are quoted in the reports as expressing fear of retribution if their names were divulged. Two sources with direct knowledge of the situation spoke to ESPN on condition of anonymity.

The investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks, the reports said. The school hired Kate Weaver Patterson, of KWP Consulting & Mediation, to investigate in spring 2023.

The second investigation cited evidence "that this is an ongoing pattern of concerning behavior by Coach Taylor." It was conducted last June and July by Timothy O'Brien, senior counsel for the Libby, O'Brien, Kingsley & Champion law firm in Maine. O'Brien, who has advised several Division I and Power 5 programs, said in his report that he has never encountered "this palpable level of animosity and disdain" for a university compliance office.

"Even during the interview with me, when talking about compliance issues, Coach Taylor's tone was forceful and aggressive," O'Brien wrote.

He called Taylor's treatment of the team's compliance officer "inappropriate, discriminatory on the basis of her sex," saying it had a "significant negative impact" on the staffer. O'Brien concluded that Taylor retaliated against the compliance staffer by "seeking her removal from her assigned duties" after she raised concerns about NCAA rules violations related to illegal practices and player eligibility.

O'Brien outlined possible disciplinary procedures, including termination, under NCAA bylaws if an employee retaliates, "such as intimidating, threatening, or harassing an individual who has raised a claim."

Taylor told investigators he believed he was being personally targeted by the compliance team, but neither investigation supported his assertion. O'Brien determined that the compliance office "took a much more forgiving and tolerant approach than was necessary," according to the documents.

O'Brien cited seven Level III violations -- minor infractions under NCAA rules -- from 2022 to 2024.

"Under Coach Taylor's leadership, the football program has disregarded or simply not followed NCAA rules that they have been repeatedly and consistently educated on by the

Compliance Office," he wrote.

Both investigations determined that Taylor's treatment of employees, particularly of women, was inconsistent with Stanford's standards.

One of the sources who spoke with ESPN on condition of anonymity said that, while Taylor is an "equal opportunity a--hole," his behavior more often targeted women.

O'Brien seemingly agreed with that assessment and noted in his report that "while being a head football coach is a stressful role, I do not find any excuse for Coach Taylor's treatment" of the women cited in the investigations.

Taylor is entering his third year as Stanford coach after back-to-back 3-9 seasons. Stanford first looked into his conduct in May 2023, just six months after his appointment, when a senior athletic department staffer raised potential gender discrimination issues with Muir, the athletic director.

Patterson, the first investigator, conducted 30 interviews over four months, including with Taylor. While Taylor called his work environment "zero drama," Patterson "found him to have a significant blind spot on how his 'direct communication' is received by staff."

In addition to finding the football culture at Stanford "not welcoming to women," Patterson wrote that the program was not "welcoming to anyone ... who cannot dedicate unrestricted time to the program" regardless of gender.

Patterson cited "belittling comments" Taylor aimed at compliance officers, saying he "expressed inappropriate anger and frustration with staff." The coach would go from "sitting there silently to screaming," a witness stated. In some situations, staffers were "scared to death to talk to him."

"[Taylor] loses his s--- over things that aren't that big of a deal," one person told Patterson.

Even staffers whom Taylor viewed as allies described his behavior as "angry, aggressive and belittling at times," Patterson wrote.

"I think people try to tip-toe and try not to get on his bad side," a source knowledgeable with the situation told ESPN.

Multiple staffers expressed a deep sense of fear of retaliation for reporting issues or cooperating with investigators. According to the documents, Doyle told Patterson that he believed Taylor froze him out of meetings because he agreed to cooperate with the investigation.

Patterson wrote that multiple people complained of Taylor repeatedly having "made inappropriate comments" about a female staffer's "appearance, smell, and interest in football."

Taylor seemed surprised that the comments were inappropriate and "expressed a desire to learn and improve" during a follow-up interview, the documents say. Patterson wrote that she found Taylor to be credible in his belief that his comments were "innocuous, without acknowledging the power and gender dynamics at play."

One of the complainants alleged that Taylor tried to have her removed from her job because of a gender bias. Patterson determined Taylor's actions in that case were not motivated by gender bias.

Patterson determined that both Taylor and Doyle violated university standards. She found that Doyle "treated staff inappropriately and in a way that discourages and/or disrespects them."

It is unclear what, if any, action resulted from the second investigation, which included no allegations against Doyle.

O'Brien launched his investigation June 4 after two new accusers filed complaints against Taylor. Staffers told O'Brien that Taylor was "hostile and aggressive" and "unable to have a productive conversation without losing his temper."

O'Brien stated that Taylor's behavior "is a continuation of the type of conduct that resulted in the Written Warning issued to him" previously. The continued behavior was "causing increasing stress and despair among those impacted," O'Brien added.

Taylor, 56, was previously the head coach of Sacramento State and was hired by Stanford in December 2022. He replaced David Shaw, who left Stanford after 12 years as head

coach. Shaw was also the winningest head coach in Stanford history with a 96-54 record but saw a record that fell to 3-9 during his last two seasons.

*ESPN researcher John Mastroberardino contributed to this report.*

# EXHIBIT B

← **Posts**    **Follow**
xuan_thai1

 **xuan_thai1**    •••

# Reports find Stanford's Taylor bullied, belittled female staffers



Stanford head coach Troy Taylor remains on the job after two investigations found he had bullied and belittled athletics staff, especially women, and made inappropriate comments about one woman's appearance. AP Photo/Matt Kelley

 Xuan Thai
Mar 19, 2025, 05:11 PM ET

♡ 18    💬 2        🔖

**xuan_thai1** Latest for ESPN. Stanford Coach Troy Taylor investigated for conduct towards staff that included bullying, belittling and retaliatory behavior according to documents obtained by ESPN.  Link in bio.

March 19

# EXHIBIT C

# Stanford's Troy Taylor found in 2 investigations to have bullied female staffers: Report



**By Jenna West**
March 19, 2025 │ Updated March 25, 2025

113

Stanford football coach Troy Taylor mistreated female staff members and tried to have an NCAA compliance officer removed after she raised concerns over rules violations, according to a report from ESPN.

ESPN obtained documents from two investigations into Taylor's behavior, where more than 20 former and current Stanford athletics staffers cooperated with investigators. The investigations began after multiple employees filed complaints against Taylor for "aggressive and hostile behavior," ESPN reports.

ADVERTISEMENT

Both investigations determined that Taylor's treatment of employees, particularly women, was inconsistent with Stanford's standards, per ESPN.

When asked for comment, Stanford supplied the same statements to *The Athletic* that it provided to ESPN.

"Stanford believes in upholding the highest standards of behavior in the workplace," a Stanford spokesperson said in one of the statements. "Last summer, the University took appropriate measures, Coach Taylor received coaching, and he has committed to nurturing the respectful working environment that is essential to the success of all our athletics programs."

The school hired Kate Weaver Patterson of KWP Consulting & Mediation to conduct the first investigation, which was launched in the spring of 2023.

In her report, Patterson wrote that multiple people complained of Taylor repeatedly making inappropriate comments about a female staffer's "appearance, smell, and interest in football." Patterson also found the culture of Stanford's football program to be "not welcoming to women." Taylor made "belittling comments" toward compliance officers and "expressed inappropriate anger and frustration with staff," per ESPN.

After the first investigation concluded, Taylor signed a warning letter in February 2024 acknowledging he could be fired if the behavior continued, according to ESPN. In a statement Wednesday, he called the investigations "a learning opportunity."

"I willingly complied with the investigations, accepted the recommendations that came out of them, and used them as a learning opportunity to grow in leadership and how I interact with others," Taylor said. "I look forward to continuing to work collaboratively and collegially with my colleagues so that we can achieve success for our football program together."

Attorney Timothy O'Brien of the law firm Libby, O'Brien, Kingsley & Champion conducted the second investigation in June after two new people filed complaints against Taylor.

ADVERTISEMENT

In his report, O'Brien called Taylor's treatment of an NCAA female compliance officer "inappropriate, discriminatory on the basis of her sex" and said Taylor retaliated against her by trying to have her removed from her job. O'Brien also said that Taylor's conduct toward staffers aligned with the behavior that resulted in his warning letter in early 2024, according to ESPN.

The second investigation ended in July, and Taylor remains Stanford's football coach.

Taylor, 56, is entering his third season at Stanford after leading the Cardinal to back-to-back 3-9 seasons.

*— The Athletic's Stewart Mandel contributed to this report.*

*(Photo: Eakin Howard / Imagn Images)*

# EXHIBIT D

# Investigations find Stanford's Troy Taylor bullied, used 'discriminatory' behavior towards female staffers

By Will Backus  Mar 20, 2025 at 11:55 am ET • 1 min read

Join the Conversation



Getty Images

A pair of investigations found Stanford coach Troy Taylor mistreated female staffers and tried to have an NCAA compliance officer removed after being warned of rule violations, according to documents obtained by ESPN. Taylor also made several "inappropriate" comments about another female's appearance.

The first investigation ended with a warning letter, signed by Taylor in February 2024, after his first season with the program. A second, in June and July, cited "an ongoing pattern of concerning behavior by Coach Taylor."

A university statement said "Stanford believes in upholding the highest standards of behavior in the workplace."

It continued: "The University received complaints regarding Coach Taylor and a third party investigated the matter thoroughly. Last summer, the University took appropriate measures, Coach Taylor received coaching, and he has committed to nurturing the respectful working environment that is essential to the success of all our athletics programs."



More than 20 former and current female staffers cooperated with investigators, per documents obtained by ESPN. One of the investigators called Taylor's treatment towards a compliance officer "inappropriate, discriminatory on the basis of her sex," and that Taylor sought "her removal from her assigned duties" for bringing up minor Level III violations.

"I willingly complied with the investigations, accepted the recommendations that came out of them, and used them as a learning opportunity to grow in leadership and how I interact with others," Taylor said in a statement. "I look forward to continuing to work collaboratively and collegially with my colleagues so that we can achieve success for our football program together."

Stanford first looked into Taylor's conduct in May 2023, per ESPN, when athletic staffer mentioned potential gender discrimination issues to athletic director Bernard Muir, who is set to resign after the current academic year.

Senior associate athletics director Matt Doyle also received a warning in February 2024 as a result of the first investigation.

"In the summer of 2023, some issues surrounding my performance were brought to my attention," Doyle told ESPN. "I took those concerns very seriously and have worked diligently on implementing feedback received from that process to support a successful and positive culture."

Andrew Luck, the team's GM who was on the committee who hired Taylor, did not respond to a request for comment by ESPN.

# EXHIBIT E



| | 2nd | ▶ ESPN/ESPN+ | Final | | Final | | | Final | |
|---|---|---|---|---|---|---|---|---|---|

# Wetzel: Bad behavior is on Stanford coach Taylor, but this is Andrew Luck's program



Stanford football GM Andrew Luck has been publicly mum since revelations that his head coach, Troy Taylor, remains on the job after two internal investigations into alleged abusive treatment of staffers. Kirby Lee-USA TODAY Sports



Dan Wetzel
Mar 22, 2025, 07:30 AM ET

Troy Taylor's record in his first two years as the Stanford football coach includes six victories and two internal disciplinary investigations.

Oh, and 18 losses.

His future would be tenuous even if he hadn't, per two separate Stanford investigations uncovered by ESPN, been accused of bullying and belittling female athletic staffers, seeking to have an NCAA compliance officer removed after she warned him of rules violations and repeatedly making "inappropriate" comments to another woman about her appearance.



EDITOR'S PICKS

Reports: Stanford coach bullied athletics staff
107d • Xuan Thai

Complaints about Taylor were enough for Stanford to twice hire outside investigative firms, both of which independently painted a picture of behavior ranging from "concerning" to "inappropriate," according to documents obtained by ESPN's Xuan

Thai.

That included numerous clashes with the school's compliance office and the attempted reassignment of duties for one staffer who raised concerns about NCAA violations pertaining to player eligibility and illegal practices. One of the law firms, experienced in these types of investigations, concluded it had never seen "this palpable level of animosity and disdain" to a compliance office.

After the first investigation, Taylor signed a "warning letter" in February 2024 acknowledging he could be fired if he didn't behave better.

By summer he was under investigation again.

It's somewhat of a mystery exactly why he remained on the job -- this is Stanford, after all, or at least is supposed to be. The NCAA violations were fairly minor, but that's all the more reason not to fight them. The attitude displayed to compliance is a red flag of its own. Again, Stanford.

Furthermore, multiple sources who spoke on the condition of anonymity told ESPN's Thai that Taylor's behavior extended beyond staffers and compliance officers to people within the coaching staff. One source said Taylor "has lost the locker room."

Yet, Taylor is preparing for Year 3 on the Farm, one more -- and presumably last -- chance to win some games and reform his leadership style.

"I willingly complied with the investigations, accepted the recommendations that came out of them, and used them as a learning opportunity to grow in leadership and how I interact with others," Taylor, 56, said in the statement to ESPN on Wednesday. "I look forward to continuing to work collaboratively and collegially with my colleagues so that we can achieve success for our football program together."

Here's hoping he's successful in that endeavor, if only for everyone else's sake. The task of leading Stanford as it transitions (and repeatedly travels) to the Atlantic Coast Conference is challenging enough without this behavior.

Taylor is dealing with another development, though, a new one that could be in play for a lot of schools in the future.

He isn't the face of the program.

The team's general manager, former Stanford and NFL great Andrew Luck, is.

Once upon a time, the head coach was the undeniable, and often indomitable, man in charge. Mostly, they still are.

It's not just the Clemson Tigers, it's Dabo Swinney's Clemson Tigers. Or Kirby Smart's Georgia Bulldogs. Or so on and so on.

The coach runs everything and hires everyone. He sets the direction, makes the decisions and speaks for the entire operation. Win enough and a coach can quickly become more powerful than the supposed bosses -- athletic directors -- and even university presidents.

The firing of a coach causes a program to reset entirely. There's a reason it's called a "program" and not just a team. It's why schools are often hesitant to make the move.

What now, though?

The role of general manager is a new one in college sports, a response to the changing ways rosters are constructed in this era of the transfer portal, revenue sharing and NIL payments. While athletic directors rarely have much stature with fans, prominent alums or big names lured from the pro ranks into a GM role could.

Luck certainly qualifies. He was a two-time Heisman runner-up for the Cardinal before becoming the No. 1 pick of the 2012 NFL draft and a four-time Pro Bowler in Indianapolis. He not only harks the program back to Stanford's glory days under Jim Harbaugh and, later, David Shaw, but he has a reputation for intelligence, integrity and football acumen.

Understandably, Stanford leapt at the chance to bring him home last November. It hasn't won more than four games since 2018. Luck is tasked with "overseeing the Cardinal Football program, including working with Coach Taylor on recruiting and roster management, and with athletics and university leadership on fundraising, alumni relations, sponsorships, student-athlete support, and stadium experience."

Perhaps on some org chart somewhere, Luck isn't the boss of all bosses. In reality, this is his program and Taylor will serve at his will.

A source with direct knowledge told ESPN's Thai that Luck met with the team in Taylor's presence on Thursday, and that Luck doubled down on standing by his coach.

Whatever Luck thinks of Taylor is unknown to fans and the public. He was on the committee that hired Taylor after a successful stint at FCS Sacramento State. He was just this week praising Taylor for his coaching skill during a Stanford pro day. However, he declined a chance to comment to ESPN on Taylor's disciplinary file.

Did he know about it? What about the NCAA violations? What about any possible issues with the treatment of players? How much will all of this weigh on his evaluation of Taylor, who even if he was up for sainthood needs to start winning?

The questions go on. The answers, thus far, are nowhere to be found.

Right now, all of Stanford's trust is in Luck, and for good reason. He has earned that. He has earned the chance to run this program through uncertain, even potentially dire, times in the ever-shifting landscape of college athletics.

It's his program now, and that means Troy Taylor is his coach; everything reflecting back on not just the school but on the all-time great in charge via a new-age job.

Terms of Use    Privacy Policy    Interest-Based Ads

© ESPN Enterprises, Inc. All rights reserved.

# EXHIBIT F



### Stanford 'needs a reset,' fires football HC Taylor
STANFORD CARDINAL  2h · Kyle Bonagura and Xu...

**Maryland names ex-NFL assistant Monachino DC**
MARYLAND TERRAPINS  6h · Adam Rittenberg

**Former U-M coach pleads not guilty in cyber case**
MICHIGAN WOLVERINES  1d · Dan Wetzel

**Ward to Titans GM at pro day: 'Solidifying' top pick**
TENNESSEE TITANS  19h · Marcel Louis-Jacques

**Day says Ohio State to visit White House April 14**
OHIO STATE BUCKEYES  1d

**UFL coach Barlow hired to coach Tennessee State**
TENNESSEE STATE TIGERS  2d · ESPN

**Elko, Aggies snag commitment from 4-star Hatton**
TEXAS A&M AGGIES  3d · Eli Lederman

**UGA suspends WR Tuggle, OL Easley indefinitely**
GEORGIA BULLDOGS  5d

**Can Florida State bounce back from its disastrous 2024 season?**
FLORIDA STATE SEMINOLES  8h · Andrea Adelson

**Which team could be the next SMU? College football teams poised to rise in 2025**

# Stanford football needs 'reset,' fires football coach Troy Taylor

Kyle Bonagura and Xuan Thai

Mar 25, 2025, 01:41 PM ET

Stanford fired football coach Troy Taylor, the school announced Tuesday.

The decision comes a week after ESPN reported that two outside firms had found Taylor bullied and belittled female athletic staffers, sought to have an NCAA compliance officer removed after she warned him of rules violations and repeatedly made "inappropriate" comments to another woman about her appearance.

"Since beginning my role as General Manager, I have been thoroughly assessing the entire Stanford football program. It has been clear that certain aspects of the program need change," Stanford football general manager Andrew Luck said in a statement. "Additionally, in recent days, there has been significant attention to Stanford investigations in previous years related to Coach Taylor.

**EDITOR'S PICKS**



**Reports: Stanford coach bullied athletics staff**
3d · Xuan Thai

**It wasn't his behavior, but this Stanford program belongs to Andrew Luck**
3d · Dan Wetzel

"After continued consideration it is evident to me that our program needs a reset. In consultation with university leadership, I no longer believe that Coach Taylor is the right coach to lead our football program. Coach Taylor has been informed today and the change is effective immediately."

It is unclear whether the university will have to pay out the remainder of Taylor's contract.

In response to ESPN's report last week, Stanford said Taylor had complied with the investigations and was committed to improving his behavior. Sources told ESPN that Luck met with the team in Taylor's presence on Thursday and doubled down on his support for the coach.

 **Stanford Football** ✔
@StanfordFball · Follow    

A statement from Stanford Football General Manager Andrew Luck.



✎ » tinyurl.com/452yye9e

Since beginning my role as General Manager, I have been
thoroughly assessing the entire Stanford football program.
It has been clear that certain aspects of the program need
change. Additionally, in recent days, there has been
significant attention to Stanford investigations in previous
years related to Coach Taylor.

After continued consideration it is evident to me that our
program needs a reset. In consultation with university
leadership I no longer believe that Coach Taylor is the right
coach to lead our football program. Coach Taylor has been
informed today and the change is effective immediately. A
search for new coaching leadership in football has begun, and
an acting coach may be named for the 2025 season. Our focus
remains on supporting our student-athletes and ensuring they
have the best possible experience on the field, in the
classroom, and on campus with their peers.

I thank Coach Taylor for his contributions to our team and the
hard work he put into the program. I wish him and his family
well moving forward.

Stanford University is my home, and I am so excited to support
our players in competing at the highest level and developing
as young adults. We have powerful traditions, incredible
student-athletes, and a vision for the future that
demonstrates our strong potential as a program. This vision
includes an emphasis on a positive, winning, and inclusive
culture. I am confident that we will return Stanford to the
top echelon of college football.

**ANDREW LUCK**
GENERAL MANAGER | STANFORD FOOTBALL

5:05 PM · Mar 25, 2025                                    ⓘ

❤️ 1.3K        💬 Reply        🔗 Copy link

Read 58 replies

According to documents obtained by ESPN, the investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks, the reports said. The school hired Kate Weaver Patterson, of KWP Consulting & Mediation, to investigate in spring 2023.

After the first investigation, Taylor signed a warning letter on Feb. 14, 2024, acknowledging he could be fired if the conduct continued, according to the documents. Additional complaints were documented in a second investigation that ended last July 24, but Taylor remained on the job.

The second investigation cited evidence "that this is an ongoing pattern of concerning behavior by Coach Taylor." It was conducted last June and July by Timothy O'Brien, senior counsel for the Libby, O'Brien, Kingsley & Champion law firm in Maine. O'Brien, who has advised several Division I and Power 5 programs, said in his report that he has never encountered "this palpable level of animosity and disdain" for a university compliance office.

"Even during the interview with me, when talking about compliance issues, Coach Taylor's tone was forceful and aggressive," O'Brien wrote.

He called Taylor's treatment of the team's compliance officer "inappropriate, discriminatory on the basis of her sex," saying it had a "significant negative impact" on the staffer. O'Brien concluded that Taylor retaliated against the compliance staffer by "seeking her removal from her assigned duties" after she raised concerns about NCAA rules violations related to illegal practices and player eligibility.

O'Brien outlined possible disciplinary procedures, including termination, under NCAA bylaws if an employee retaliates, "such as intimidating, threatening, or harassing an individual who has raised a claim."

One source with direct knowledge told ESPN that Taylor has "lost the locker room." Two sources told ESPN that Taylor's behavior extended beyond athletic department and compliance office staff and onto the field.

Taylor had back-to-back 3-9 seasons before he was fired. He was previously the head coach at Sacramento State.

In a statement to ESPN last week, Taylor said he was using the investigations as a "learning opportunity."

"I willingly complied with the investigations, accepted the recommendations that came out of them, and used them as a learning opportunity to grow in leadership and how I interact with others," Taylor said. "I look forward to continuing to work collaboratively and collegially with my colleagues so that we can achieve success for our football program together."

Taylor did not immediately respond to a message from ESPN seeking comment on Tuesday's firing.

*Pete Thamel contributed to this report.*

Terms of Use   Privacy Policy   Interest-Based Ads

© ESPN Enterprises, Inc. All rights reserved.

# EXHIBIT G



Top Events

Tennis (M)

🇧🇬 1 J. Sinner        3  1
🇧🇬 19 G. Dimitrov    6  2

🇭🇷 M. Cilic           4  4  7⁷  6³
🇮🇹 22 F. Cobolli    6  6  6⁴  7⁷

🇦🇷 11 A. de Minaur    4  4  4
🇷🇸 N. Djokovic        6  6  6

🇺🇸 10 B. Shelton    3  6  7⁷  7
🇮🇹 L. Sonego        6  1  6¹  5

Tennis (V

ESPN    NFL    NBA    NHL    MLB    NCAAF    More Sports    ESPN+    ESPNBET    Watch    Fantasy

NCAAF    Home    NFL Draft    Scores    Schedule    Rankings ⌄    Teams    Standings    Stats ⌄    More ⌄

### Taylor takes issue with findings of Stanford probe
STANFORD CARDINAL  82d  - Xuan Thai

### ACC preview: Road to title again figures to go through Clemson
CLEMSON TIGERS  8h  - Bill Connelly

### Irish OL Jagusah fractures arm in UTV accident
NOTRE DAME FIGHTING IRISH  1d  - Adam Ritten…

### Sources: OU AD Castiglione to leave full-time role
OKLAHOMA SOONERS  4h  - Pete Thamel

### ESPN 300 CB Kennon commits to Florida State
FLORIDA STATE SEMINOLES  21h  - Eli Lederman

### Irish land WR Fitzgerald, son of ex-NFL star Larry
NOTRE DAME FIGHTING IRISH  2d  - Eli Lederman

### Russell, No. 4 WR in 2026, commits to Syracuse
SYRACUSE ORANGE  2d  - Eli Lederman

### Bama rolls on with commit from 5-star S Edwards
ALABAMA CRIMSON TIDE  2d  - Eli Lederman

### Under-the-radar players who could emerge for every top 25 team
LOUISVILLE CARDINALS  5d  - ESPN

### Under-the-radar players who could emerge for every top 25 team
LOUISVILLE CARDINALS  5d  - ESPN

# Ex-Stanford coach Troy Taylor takes issue with investigation

 Xuan Thai
Apr 16, 2025, 03:41 PM ET

Former Stanford head football coach Troy Taylor released a statement about his firing Wednesday, taking issue with the findings of two separate workplace investigations conducted during his two-year tenure.

Taylor said he was not fired for cause and called coverage of the firing "unfair." In a statement posted on X by Ross Dellenger of Yahoo Sports, Taylor acknowledged that both investigations were launched after complaints were made about his workplace behavior.

Taylor did not acknowledge any wrongdoing in his statement, although he said he had not obtained the text of the two investigation reports in which multiple complainants were quoted.

ESPN obtained copies of both investigations and was first to report on the findings. Taylor described the first investigation, concluded in mid-2023, as involving only one complaint and one complainant.

While the investigation was initially launched in response to a single complainant who alleged gender bias and "a culture problem in football," the investigation ultimately included interviews with at least 20 Stanford athletic department staffers regarding four allegations against Taylor. Three of the allegations regarding belittling and inappropriate behavior toward multiple women were deemed to have merit. The investigator did find "insufficient evidence" regarding the original complaint.

"Although I disagreed with the [first] complaint, I took it seriously and fully cooperated," Taylor said in the statement. "The [first] investigation, which I have still never seen, concluded I did not act unfairly."

Taylor called media coverage of him "unfair, wrong, and contrary to my professional record and the person that I am and have always been."

EDITOR'S PICKS



**Luck: 'Clarity after time' led to Taylor dismissal**
97d • Kyle Bonagura

**Stanford 'needs a reset,' fires football HC Taylor**
104d • Kyle Bonagura and Xuan Thai

**Reports: Stanford coach bullied athletics staff**
107d • Xuan Thai

ESPN reached out to Taylor's attorney for additional comment, but did not get an immediate response. Additionally, Stanford did not immediately respond to ESPN's inquiries about Taylor's statement.

Taylor was fired in March, a week after ESPN reported findings that Taylor had bullied and belittled multiple female athletic staffers, sought to have an NCAA compliance officer removed after she warned him of rules violations and repeatedly made "inappropriate" comments to another woman about her appearance.

Andrew Luck, the team's general manager and former star quarterback, said at the time that the team needed a "reset."

"Since beginning my role as General Manager, I have been thoroughly assessing the entire Stanford football program. It has been clear that certain aspects of the program need change," Luck said in a statement. "Additionally, in recent days, there has been significant attention to Stanford investigations in previous years related to Coach Taylor."

The investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks, the reports said. The school hired Kate Weaver Patterson, of KWP Consulting & Mediation, to investigate in spring 2023.

After the first investigation, Taylor signed a warning letter on Feb. 14, 2024, acknowledging he could be fired if the conduct continued, according to the documents. Additional complaints were documented in a second investigation in the first half of 2024, but Taylor remained on the job.

The second investigation cited evidence "that this is an ongoing pattern of concerning behavior by Coach Taylor." It was conducted in June and July by Timothy O'Brien, senior counsel for the Libby, O'Brien, Kingsley & Champion law firm in Maine. O'Brien, who has advised several Division I and Power 5 programs, said in his report that he has never encountered "this palpable level of animosity and disdain" for a university compliance office.

"Even during the interview with me, when talking about compliance issues, Coach Taylor's tone was forceful and aggressive," O'Brien wrote.

He called Taylor's treatment of the team's compliance officer "inappropriate, discriminatory on the basis of her sex," saying it had a "significant negative impact" on the staffer. O'Brien concluded that Taylor retaliated against the compliance staffer by "seeking her removal from her assigned duties" after she raised concerns about NCAA rules violations related to illegal practices and player eligibility.

O'Brien outlined possible disciplinary procedures, including termination, under NCAA bylaws if an employee retaliates, "such as intimidating, threatening, or harassing an individual who has raised a claim."

Taylor had back-to-back 3-9 seasons before he was fired. He was previously the head coach at Sacramento State Hornets.