UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| TROY TAYLOR,<br><br>            Plaintiff,<br><br>    v.<br><br>ESPN, INC., et al.,<br><br>            Defendants. | Case No.  25-cv-06384-VKD<br><br>**ORDER GRANTING DEFENDANTS'<br>MOTION TO DISMISS AND<br>GRANTING DEFENDANTS' MOTION<br>TO STRIKE**<br><br>Re: Dkt. Nos. 11, 12, 15 |

Plaintiff Troy Taylor sues ESPN, Inc. ("ESPN") and ESPN reporter Xuan Thai (collectively, "defendants"), asserting a single claim for defamation.  Mr. Taylor's complaint invokes the Court's diversity jurisdiction, 28 U.S.C. § 1332.  Defendants move pursuant to Rule 12(b)(6) to dismiss Mr. Taylor's complaint.  Dkt. No. 11.  They also move to strike the complaint under California Code of Civil Procedure § 425.16 ("anti-SLAPP" statute).[1]  Dkt. No. 12.  Mr. Taylor opposes both motions.  Dkt. Nos. 29, 30.  Upon consideration of the moving and responding papers, as well as the oral arguments presented, the Court grants defendants' Rule 12(b)(6) motion to dismiss and grants defendants' motion to strike, without leave to amend.[2]

---

[1] "SLAPP" is an acronym for "Strategic Lawsuit Against Public Participation."  The purpose of the anti-SLAPP statute is "to protect individuals from meritless, harassing lawsuits whose purpose is to chill protected expression."  *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 838 n.7 (9th Cir. 2001).

[2] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 9, 22.

United States District Court
Northern District of California

## I.      BACKGROUND

The following facts are drawn from the allegations of the complaint.[3]

Mr. Taylor is the former head football coach at Stanford University ("Stanford").  He was employed by Stanford in that capacity from December 2022 until his termination in March 2025.  Dkt. No. 1 ¶¶ 1, 12.  Mr. Taylor claims that beginning on March 19, 2025, defendants published several false and defamatory articles about him and two workplace investigations conducted in 2023 and 2024.  *Id*. ¶¶ 26, 34 & Exs. A, B, E-G.  The investigations were "completed approximately fifteen months and eight months, respectively, before the March 19 article was published," and Mr. Taylor says that both he and Stanford "acknowledged the results of the investigations and moved on."  *Id*. ¶ 26.  However, Mr. Taylor alleges that in or around March 2025, someone with access to his confidential personnel records and to the confidential reports of the workplace investigations improperly leaked those materials to defendants.  *Id*.  After receiving the leaked materials from an anonymous source, defendants allegedly reported the contents of the leaked documents "in a misleading and sensationalized manner," "falsely reported the investigatory findings themselves," and "use[d] their false reporting to publicly pressure Stanford to fire [Mr.] Taylor from his job."  *Id*. ¶¶ 26, 34.

In his complaint, Mr. Taylor says that he has not received complete information about the workplace investigations.  *See id*. ¶ 27.  He notes that defendants declined his request to provide him with the two workplace investigation reports.  *See id*. ¶ 32, n.2.  However, he has obtained "more details about the first investigation than about the second," and was provided with a summary of the first investigation's findings in December 2023.  *Id*. ¶¶ 27, 28.

With respect to the first investigation, Mr. Taylor states that that investigation was initiated based on a complaint that Mr. Taylor "had requested to replace the 'football administrator' based on her gender."  *Id*. ¶ 28.  Stanford engaged Kate Weaver Patterson, an outside reviewer, "'to assess the culture of the football program and conduct a review of various allegations related to whether DAPER [Department of Athletics, Physical Education and Recreation] employees are

---

[3] Defendants' request for consideration of materials under the incorporation-by-reference doctrine and their request for judicial notice are addressed below.

mistreated or disrespected in general and/or due to gender.'" *Id*. ¶ 28 & n.1.

Following the investigation, in December 2023, Bernard Muir (Stanford's Director of Athletics at that time) gave Mr. Taylor a warning letter that included a summary of the first investigation's findings. Dkt. No. 1 ¶ 29. According to Mr. Taylor, the first investigation found "insufficient evidence" to support the allegation that Mr. Taylor asked to replace an administrator based on her gender. *Id.* ¶ 28. In addition, the complaint alleges that the first investigation made no finding "that [Mr.] Taylor had 'bullied' or 'belittled' female staffers or that [Mr.] Taylor had engaged in any 'hostile' or 'aggressive behavior' targeted at women." *Id.* ¶ 28. Rather, Mr. Taylor alleges that Mr. Muir's written warning was "due primarily to [Mr.] Taylor's 'communication style.'" *See id.* ¶ 29. According to Mr. Taylor, Mr. Muir acknowledged Mr. Taylor's "important contributions to [Stanford's] program," "improvements in [his] communication style," and his "willingness to learn and grow." *Id*. The complaint further alleges that "Stanford communicated to [Mr.] Taylor that they were happy with his job performance and that they wanted him to remain as Stanford's head football coach for many years." *Id.* ¶ 30. In particular, Mr. Taylor says that "[b]y letter dated February 29, 2024, which was signed on March 8, 2024, Stanford agreed to extend the term of [his] appointment as head coach and to increase both the amount of [his] annual base salary and the amount of any buy-out in the event that his employment contract was terminated early." *Id*.

The complaint alleges that "[i]t was around this same time that Stanford launched the second workplace investigation." *Id*. ¶ 31. Specifically, "[i]n or about March 2024, Stanford received a complaint from a compliance officer regarding [Mr.] Taylor," following "a discussion between [Mr.] Taylor and the compliance officer about the physical speed at which Stanford players could participate in a 'walk-through.'" *Id*. The complaint further alleges that "[d]uring their conversation, [Mr.] Taylor expressed frustration that the compliance officer was interpreting NCAA rules in an overly restrictive way that was not required by the rules themselves." *Id*. Mr. Taylor maintains that the conversation "was direct, but entirely professional and not particularly heated." *Id*. Two witnesses (a male and a female) reportedly stated at that time that Mr. Taylor's "handling of the conversation with the compliance officer was appropriate." *Id*.

United States District Court
Northern District of California

Stanford engaged a different outside reviewer, Timothy O'Brien, to conduct a second workplace investigation. *Id.* ¶ 32. Following his investigation, Mr. O'Brien made findings against Mr. Taylor, including that Mr. Taylor's treatment of the compliance officer was "inappropriate, discriminatory on the basis of her sex," and that it "had a significant negative impact on her." *Id.*, Exs. A, C, D, F, G. Additionally, Mr. O'Brien concluded that Mr. Taylor retaliated against the compliance officer by "seeking her removal from her assigned duties" after she raised concerns about NCAA rules violations. *See id.*, Exs. A, C, F.

Mr. Taylor says that although he has not received a copy of the report of the second investigation, he "contested the findings as summarized for him, but ultimately agreed to what he considered to be modest conditions for the good of the program, including forfeiting an agreed upon raise for twelve months, issuing a non-public apology, and changing his tone." *Id.* ¶ 32.

At some point, materials about the workplace investigations reportedly were leaked to defendants. According to the complaint, the alleged defamatory reporting began with a March 19, 2025 article under the headline, "Reports find Stanford's Taylor bullied, belittled female staffers." *Id.* ¶¶ 26, 35 & Ex. A. Mr. Taylor alleges that this headline is false "because 'both investigations' did not make this determination." *Id.* ¶ 35. Additionally, Mr. Taylor alleges that the March 19, 2025 article falsely stated: "'The investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks.'" *Id.* He alleges that this statement is false because "[i]n reality, the first investigation began after a single complaint by a single individual that [Mr.] Taylor wanted to replace the football administrator because she is a woman"—an allegation for which the first investigation found "insufficient evidence." *Id.* Defendant Ms. Thai posted the March 19, 2025 article to her Instagram page. *Id.* ¶ 37, Ex. B. Both the March 19, 2025 article and Ms. Thai's Instagram post include a photo with the caption, "Stanford head coach Troy Taylor remains on the job after two investigations found he had bullied and belittled athletics staff, especially women, and made inappropriate comments about one woman's appearance." *Id.* ¶¶ 36, 37 & Exs. A & B. Mr. Taylor alleges that defendants' "initial reporting gave the unmistakable and false impression that [he] had engaged in widespread bullying and belittling of female staff, that numerous complaints

against [him] had been made to that effect, and that two separate investigations by two different investigators had made findings that [he] 'targeted' multiple women with hostile, aggressive, and discriminatory conduct." *Id.* ¶ 37.

On March 22, 2025, ESPN reporter Dan Wetzel published an article titled, "Wetzel:  Bad behavior is on Stanford coach Taylor, but this is Andrew Luck's program."  *Id.* ¶ 39 & Ex. E.  As discussed below, while the complaint alleges that Mr. Wetzel's article is also false and defamatory, at the motion hearing, Mr. Taylor clarified that he is not challenging any particular statement in that article as an actionably false statement of fact.  Rather, Mr. Taylor maintains that Mr. Wetzel's article provides context regarding the alleged amplification and reiteration of defendants' prior reporting.  *See* Dkt. No. 36; *see also* Dkt. No. 1 ¶¶ 40-41.

"By letter dated March 25, 2025," Mr. Taylor says that he "notified [d]efendants that their reporting about him had been inaccurate and unfair," but he received no response to that letter from anyone at ESPN.  *Id.* ¶ 42.  On that same day, Stanford announced that it was terminating Mr. Taylor's contract and replacing him as Stanford's head football coach.  *Id.* ¶ 43.  Additionally, on March 25, 2025, defendants and another ESPN reporter published a third allegedly defamatory article about Mr. Taylor on ESPN.com, "repeating their prior false statements about the investigatory findings and taking credit for [Mr.] Taylor's firing[.]"  *Id.* ¶ 44 & Ex. F.

To counter what he claims is defendants' "false narrative" regarding the two workplace investigations, Mr. Taylor says that on April 16, 2025, he issued a public statement to present his side of the story.  *Id.* ¶ 45.  But "[r]ather than covering [Mr.] Taylor's public statement in an honest way," defendants allegedly "used it to double down on their prior reporting and to make more false statements," including a statement that "'[t]hree of the allegations [in the First Investigation] regarding belittling and inappropriate behavior toward multiple women were deemed to have merit.'"  *Id.* ¶¶ 46, 47 (quoting Ex. G at ECF 53).

Mr. Taylor says that he notified defendants by letter dated April 17, 2025 "that their reporting about him included numerous false and defamatory statements that were causing real and substantial harm to him and his reputation."  *Id.* ¶ 48.  He also requested a retraction.  *Id.* ESPN reportedly did not respond until May 8, 2025, "declining to retract any of the articles and

5

stating that it 'fully stands by both the accuracy and propriety of its reporting.'" *Id.*

Mr. Taylor filed this action in July 2025. Dkt. No. 1. At the hearing on defendants' present motions to dismiss and to strike the complaint, Mr. Taylor clarified that he does not take issue with defendants' reporting of the second (2024) workplace investigation. *See* Dkt. No. 36. Rather, he principally challenges defendants' reporting regarding the first (2023) workplace investigation. He contends that the articles in question mischaracterize certain findings and attribute findings to *both* investigations, whereas Mr. Taylor maintains that the first investigation made no such findings. *See, e.g.,* Dkt. No. 1 ¶¶ 35, 38, 52, 57, 58. He alleges that defendants took statements from the workplace investigation reports "out of context and/or juxtaposed facts in a manner intended to imply a defamatory connection and to create a defamatory implication about [him]." *Id.* ¶ 58. He further alleges that "[t]hrough this reporting, [d]efendants exaggerated and distorted both the nature of the allegations against [him] and the investigatory findings," and "maximized the public pressure on Stanford to fire him from his job." *Id.* Mr. Taylor maintains that it was not his conduct or the workplace investigations' findings, but rather defendants' alleged false reporting, that led to his termination. *See, e.g.,* Dkt. No. 1 ¶¶ 43, 45.

Defendants move to dismiss the complaint pursuant to Rule 12(b)(6), arguing that the complaint fails to plead a plausible claim for defamation because (1) Mr. Taylor is a public figure who is required to, but did not, plead actual malice; and (2) the alleged defamatory statements are substantially true. Defendants also move to strike the complaint under California's anti-SLAPP statute. In connection with their motions, defendants ask the Court to consider materials outside the pleadings and to permit portions of these materials, and references to them, to be filed under seal.

The Court first addresses defendants' motion to seal and motion for consideration of materials outside the pleadings. At the motion hearing, the parties agreed that defendants' anti-SLAPP motion to strike challenges the legal sufficiency of the complaint's allegations and that the Rule 12(b)(6) standard applies to the resolution of that motion. Accordingly, the Court will first address defendants' Rule 12(b)(6) motion to dismiss, followed by defendants' motion to strike

United States District Court
Northern District of California

## II.   DEFENDANTS' MOTION TO SEAL

Defendants move to seal several exhibits to their Rule 12(b)(6) motion to dismiss. *See* Dkt. No. 15. The exhibits in question include Mr. Muir's December 2023 letter to Mr. Taylor summarizing the findings of the first investigation, as well as the reports of the 2023 and 2024 workplace investigations themselves. *See* Dkt. No. 13, Exs. 1-3. Defendants also move to seal portions of their opening brief in support of the Rule 12(b)(6) motion to dismiss (Dkt. No. 11), which reveal names and other identifying information about non-parties involved in the two workplace investigations. Mr. Taylor does not oppose defendants' sealing motion. *See* Dkt. No. 15-1 ¶ 7.

The Court finds compelling reasons to grant defendants' motion to seal, as the subject information concerns confidential personnel matters and/or implicates the personal privacy interests of non-parties. *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006) ("Those who seek to maintain the secrecy of documents attached to dispositive motions must meet the high threshold of showing that 'compelling reasons' support secrecy."). The identities of those non-parties do not bear on the resolution of the pending motions. As the documents in question have not been made public, the Court grants defendants' request to maintain those documents under seal. However, this order does not seal, and publicly discusses, aspects of the subject documents that have already been publicly disclosed through Mr. Taylor's complaint, the articles at issue, and in the parties' respective briefing and oral arguments on the present motions.

## III.   DEFENDANTS' MOTION TO DISMISS

### A.   Legal Standard

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is appropriate where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory. *Id*. (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). In such a motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the claimant. *Id*.

A complaint should be dismissed for failure to state a claim if it fails to set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 12(b)(6). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555 (citations omitted). Moreover, the Court is not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Prager Univ. v. Google LLC*, No. 17-cv-06064-LHK, 2018 WL 1471939, at *3 (N.D. Cal. Mar. 26, 2018) (quoting *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam)). Nor does the Court accept allegations that contradict documents attached to the complaint or incorporated by reference, *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014), or that rest on "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

**B.      Defendants' Request for Consideration of Documents Outside the Pleadings**

Defendants ask the Court to consider materials outside the pleadings in resolving their motion to dismiss. *See* Dkt. No. 11 at ECF 12 n.2, ECF 13 n.3, ECF 14 n.4; Dkt. No. 14; Dkt. No. 34 at ECF 7-8. "Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). "There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201." *Id.*

**1.      Incorporation-by-Reference Doctrine**

"Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja*, 899 F.3d at 1002. "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom— their claims." *Id.* "[T]he mere mention of the existence of a document is insufficient to

8

incorporate the contents of a document." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010); *see also Khoja*, 899 F.3d at 1002 (same).  However, documents may be incorporated into a complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Khoja*, 899 F.3d at 1002 (citation modified; citation omitted).

Defendants ask the Court to consider three documents under the incorporation-by-reference doctrine:  Mr. Muir's December 2023 letter to Mr. Taylor summarizing the first investigation, as well as the reports of the 2023 and 2024 workplace investigations.  *See* Dkt. No. 13, Exs. 1-3; *see also* Dkt. No. 11 at ECF 12 n.2, ECF 13 n.3, ECF 14 n.4; Dkt. No. 34 at ECF 7-8.  As confirmed at the motion hearing, Mr. Taylor does not contest the authenticity of any of these documents.  *See* Dkt. No. 36.  Nor does he state an objection to the Court's consideration of the December 2023 letter summarizing the first investigation's findings.  Indeed, Mr. Taylor's complaint explicitly refers to and quotes from that December 2023 letter, and relies on portions of its contents in support of his allegations.  *See* Dkt. No. 1 ¶¶ 28, 29.  Accordingly, the Court considers the December 2023 letter under the incorporation-by-reference doctrine.

Mr. Taylor opposes defendants' request for consideration of the 2023 and 2024 workplace investigation reports.  *See* Dkt. No. 29 at ECF 29-30.  He argues that his defamation claim is not based on the *full* reports, as neither he nor his counsel had access to the entire reports at the time the complaint was prepared.  He further argues that at this stage of the litigation, defendants should not be permitted to present the full reports to support their interpretation of the reports' findings.  *See* Dkt. No. 29 at ECF 30.

The Court is not persuaded that Mr. Taylor's lack of access to the full workplace investigation reports is material to the determination of whether those reports are incorporated by reference in his complaint.  The complaint is replete with allegations that defendants falsely reported and mischaracterized the workplace investigation reports themselves, as well as the reports' respective findings.  *See* Dkt. No. 1 ¶¶ 2, 4-5, 25-28, 33-42, 44-49, 52-58.  Additionally, Mr. Taylor acknowledged at oral argument that his defamation claim depends on the investigation reports and their contents; indeed, he maintains that the reports' findings demonstrate the falsity of defendants' reporting in the articles at issue (*see* Dkt. No. 29 at ECF 30).  Accordingly, the 2023

and 2024 workplace investigation reports properly may be considered under the incorporation-by-reference doctrine, as Mr. Taylor's complaint refers extensively to the reports, and the reports form the basis of his claim. *See Khoja*, 899 F.3d at 1002; *see also Knievel v. ESPN,* 393 F.3d 1068, 1076 (9th Cir. 2005) (noting extension of incorporation-by-reference doctrine "to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint.") (citation omitted); *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) (court did not err in considering deposition transcript on motion to dismiss, where civil rights complaint alleged that the deposition testimony contradicted statements in allegedly false warrant affidavit).

In his opposition papers, Mr. Taylor argues that if the Court considers the workplace investigation reports in resolving defendants' motion to dismiss, then he requests an opportunity to conduct discovery in order to "present all evidence that is pertinent to the motion," citing Rule 12(d). *See* Dkt. No. 29 at ECF 30. For the reasons discussed above, the workplace investigation reports properly may be considered without converting defendants' Rule 12(b)(6) motion into one for summary judgment. In any event, Mr. Taylor does not explain what discovery he believes is relevant to the resolution of the present motion to dismiss. At the motion hearing, Mr. Taylor indicated he intended to seek discovery regarding what defendants had in their possession at the time of the challenged reporting. However, he did not explain how or why that information is pertinent to the resolution of defendants' motion to dismiss. He also acknowledged that there is nothing to indicate that the documents submitted by defendants in support of their motion are incomplete. Accordingly, the Court denies Mr. Taylor's request for leave to obtain and present additional evidence outside the pleadings in opposition to the motion to dismiss.

### 2.    Judicial Notice

Federal Rule of Evidence 201 permits the Court to take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot

United States District Court
Northern District of California

reasonably be questioned." Fed. R. Evid. 201(b); *see also Khoja*, 899 F.3d at 999 (same). Accordingly, a court may take judicial notice of matters of public record. *Khoja*, 899 F.3d at 999. "But a court cannot take judicial notice of disputed facts contained in such public records." *Id.*

Defendants ask the Court to take judicial notice of seven news articles, four of which concern Mr. Taylor's employment as head football coach at Stanford (*see* Dkt. No. 13 ¶ 6 & Ex. 4),[4] and three of which defendants say concern "women in male-dominated sports" (*see* Dkt. No. 13 ¶ 7 & Ex. 5).[5] Dkt. No. 14. Defendants argue that these materials are relevant to both the Rule 12(b)(6) motion to dismiss and the anti-SLAPP motion to strike, as they support Mr. Taylor's status as a public figure. *Id.* at ECF 3. Mr. Taylor does not state an objection to defendants' request for judicial notice.

The Court grants defendants' request for judicial notice of each of the seven articles as unopposed; however, the Court takes judicial notice of the articles for the purpose of noting the existence of news coverage regarding Mr. Taylor and the general topic of women in sports, but not for the truth of any matters asserted in the articles. *See Von Saher v. Norton Simon Museum of Art*, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may take judicial notice of publications introduced to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.") (citations omitted).

### C.    Whether the Complaint States a Claim for Defamation

Under California law, "defamation 'involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage.'" *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1157 (9th Cir. 2021) (quoting

---

[4] "Stanford hires Sacramento State's Troy Taylor: What the coach brings to the Cardinal," *The New York Times* (December 10, 2022); "'Stanford hires Sacramento State's Troy Taylor to rebuild football program," *San Francisco Chronicle* (December 10, 2022); "Troy Taylor continues to usher Stanford into the modern era of college football," *Sports Illustrated* (May 13, 2023); and "Stanford GM Andrew Luck fires football coach Troy Taylor following bullying allegations," *The New York Times* (March 25, 2025).

[5] "The NFL's Female Coaching Surge Is Here," *The New York Times* (July 16, 2025); "NFL boasts highest number of female coaches in history, and counting," *Berkeley Beacon* (September 25, 2024); and "As Charlotte's coaches conference showed, women are following in Jen King's path," *The Charlotte Observer* (February 23, 2024),

*Gilbert v. Sykes*, 147 Cal. App. 4th 13, 53 (2007)); *see also Taus v. Loftus*, 40 Cal.4th 683, 720 (2007) (elements of defamation are "(a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage"); *see also* Cal. Civ. Code § 45 (libel defined).

### 1. Public Figure

"A threshold determination in a defamation action is whether the plaintiff is a 'public figure.'" *McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97, 113 (2007). There are two types of public figures: (1) an "all-purpose" public figure, who "may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts" and (2) a "limited purpose" or "vortex" public figure, who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974); *see also McGarry*, 154 Cal. App. 4th at 113 (same). "Unlike the 'all purpose' public figure, the 'limited purpose' public figure loses certain protection for his reputation only to the extent that the allegedly defamatory communication relates to his role in a public controversy." *Reader's Digest Ass'n, Inc. v. Superior Ct.*, 37 Cal.3d 244, 253-54 (1984). To prevail on a defamation claim, a public figure must not only prove that the challenged statements are false, but must also establish, by clear and convincing evidence, that the alleged defamatory statements were made with actual malice. *See id.* at 331-32; *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 889 (9th Cir. 2016); *Gilbert*, 147 Cal. 4th at 26.

Contending that Mr. Taylor is at least a limited public figure, if not a public figure for all purposes, defendants argue that the complaint must be dismissed because it fails to plausibly plead facts demonstrating that the alleged defamatory statements were made with actual malice, "that is, with knowledge that [the statements] w[ere] false or with reckless disregard of whether [they] w[ere] false or not," *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). Mr. Taylor maintains that he "is a private citizen, (formerly) employed by a private entity." Dkt. No. 1 ¶ 51. He argues that defendants cannot establish that he is a public figure when "the public controversy over whether Stanford should fire [him] was created entirely by [d]efendants' reporting." Dkt. No. 29 at ECF 25. He further argues that the complaint sufficiently alleges facts supporting actual

12

malice, in any event. *See id*. at ECF 26-29.

"Whether an individual is a public figure is a question of law that must be assessed through a totality of the circumstances." *Manzari*, 830 F.3d at 888 (citing *Readers Digest*, 37 Cal.3d at 252-53). On the record presented, the Court cannot conclude that Mr. Taylor is an all-purpose public figure. *See Gertz*, 418 U.S. at 352 ("Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life."). There is a question whether Mr. Taylor is "generally famous" by virtue of his achievements as an athlete, his career as an educator and football coach, and most recently his prominent position as Stanford's head football coach, such that he should be considered a public figure for all purposes. *See Makaeff v. Trump Univ.*, 715 F.3d 254, 265 (9th Cir. 2013). Indeed, Mr. Taylor alleges that by the time he became Stanford's head football coach, he had already achieved certain prominence, including as an NFL athlete, the founder of "The Passing Academy, an elite quarterback training camp for high school athletes," an NCAA Division 1 coach of the year, and as someone whose appointment as Stanford's head football coach was supported by "Stanford's now-football General Manager Andrew Luck, a legendary quarterback" and "Former Secretary of State Condoleezza Rice." *See* Dkt. No. 1 ¶¶ 16-22. In *Curtis Publishing Co. v. Butts,* 388 U.S. 130 (1967), one of two companion cases in which the Supreme Court extended First Amendment protections to defamatory criticisms of "public figures" who are not "public officials," the court considered whether Mr. Butts, the head football coach for the University of Georgia, was such a public figure. In concluding that he was, the Supreme Court observed that he "commanded a substantial amount of independent public interest at the time of the [alleged defamatory] publications" and "may have attained that status by position alone." *Curtis,* 388 U.S. at 154-155. Subsequently in *Gertz*, the Supreme Court explained:

> Those classed as public figures stand in a similar position [to public officials]. Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are

13

> deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.
>
> * * *
>
> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

*Gertz*, 418 U.S. at 345, 351; *see also Manzari*, 830 F.3d at 888 ("Even before the Supreme Court's public figure analysis, we observed that public figures for defamation purposes include, artists, athletes, business people, dilettantes, anyone who is famous or infamous because of who he is or what he has done.") (citation modified; citation omitted). However, while it is difficult to distinguish Mr. Taylor's circumstances from those of coach Butts in *Curtis,* the present record does not permit the Court to conclude definitively that Mr. Taylor is a public figure for all purposes.

Defendants nonetheless maintain that Mr. Taylor is at least a limited purpose public figure with respect to the articles in question. *See* Dkt. No. 34 at ECF 15. In determining whether Mr. Taylor is a limited purpose public figure, the Court applies the Ninth Circuit's three-factor test and considers whether (1) "a public controversy existed when the [challenged] statements were made"; (2) "whether the alleged defamation is related to [Mr. Taylor]'s participation in the controversy"; and (3) "whether [Mr. Taylor] voluntarily injected [him]self into the controversy for the purpose of influencing the controversy's ultimate resolution." *Makaeff*, 715 F.3d at 266; *see also Planet Aid, inc. v. Reveal*, 44 F.4th 918, 925 (9th Cir. 2022) (same). Although neither Mr. Taylor nor defendants have clearly articulated or defined the scope of this inquiry, the Court will apply these factors in assessing whether Mr. Taylor is a public figure for the limited purpose of his defamation claim in this action.

Defendants argue that Mr. Taylor became a limited purpose public figure when he voluntarily assumed the head coaching position at Stanford, if not long before then. *See* Dkt. No.

14

34 at ECF 16-17. As noted above, defendants also submit for judicial notice various articles indicating that Mr. Taylor's "appointment as Stanford's head football coach, his record at Stanford, and his firing each were a matter of public interest." *See* Dkt. No. 11 at ECF 29; *see also* Dkt. No. 13, Ex. 4; Dkt. No. 14.

However, the test for determining whether a person is a limited purpose public figure is premised on the existence of a "public controversy" at the time the challenged statements were made. *Planet Aid*, 44 F.4th at 925; *Makaeff*, 715 F.3d at 266. "Public interest or attention alone is not sufficient to create a public . . . controversy." *Planet Aid*, 44 F.4th at 926. The Ninth Circuit distinguishes between matters of "general interest," which are "not sufficient to create a public controversy," and "an actual dispute." *Makaeff*, 715 F.3d at 267 (citations omitted). In this context, "a public controversy must be a real dispute, the outcome of which affects the general public or some segment of it." *Id*. (quotations and citation omitted); *see also Gilbert*, 147 Cal. App. 4th at 24 ("[A] public controversy . . . means the issue was debated publicly and had foreseeable and substantial ramifications for nonparticipants."); *Carver v. Bonds*, 135 Cal. App. 4th 328, 353 (2005) ("The public interest test was expressly rejected [by the Supreme Court in] in favor of the public controversy test."). Thus, for example, in *Makaeff*, the Ninth Circuit found that the defendant entity was a limited purpose public figure, noting that "any general interest in [defendant] stemming from its celebrity founder soon ripened into an actual dispute over [defendant]'s business and educational practices." *Makaeff*, 715 F.3d at 267. Similarly, in *Planet Aid*, "genuine public controversies existed at the time [of the challenged reporting]" where "[l]ong before the Reporters published any articles about Planet Aid, countless news outlets published articles questioning Planet Aid's integrity and examining the extent to which its charitable funds were being used for their intended purposes." *Planet Aid*, 44 F.4th at 925.

In their motion to dismiss, defendants do not clearly identify the "public controversy" they claim existed at the time the articles at issue were published. In their reply, defendants emphasize that the Ninth Circuit has warned against too-narrow definitions of "public controversy." Dkt. No. 34 at ECF 15. Principally relying on *McGarry*, defendants argue that Mr. Taylor's position as Stanford's head football coach and the reasons for his termination were matters of public debate.

15

*See* Dkt. No. 11 at ECF 29-30.  However, in *McGarry*, the plaintiff-coach's employment termination occurred *before* the alleged defamatory statements were made.  *See McGarry*, 154 Cal. App. 4th at 104 & n.3.  Here, Mr. Taylor contends that the first allegedly defamatory article, published on March 19, 2025, was published before he was terminated, and indeed, created public pressure on Stanford that led to his termination.  *See, e.g.*, Dkt. No. 1 ¶¶ 2, 3, 6, 25, 26, 34, 41, 54, 58; *see also* Dkt. no. 29 at ECF 7, 9, 11, 14, 20, 25-26.  Notably, *McGarry* distinguished the alleged "transgressions" at issue in that case from "confidential personnel information" that is not public or is not "otherwise known to the public."  *Id*. at 111.  Here, the record presented indicates that the "public controversy" about Mr. Taylor and his position as Stanford's head football coach stemmed from the leaked confidential personnel matters and 2023 and 2024 workplace investigations that otherwise were not publicly known.  *See Hutchinson v. Proxmire*, 443 U.S. 111, 112-13 (1979) ("Those charged with alleged defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."); *McGarry*, 154 Cal. App. 4th at 110 ("A person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people.") (citations omitted).

Mr. Taylor's complaint and news articles submitted by defendants demonstrate that there certainly was public interest in Mr. Taylor and his performance as Stanford's head football coach, but the Court is not prepared to conclude on the present record that there was an existing "public controversy" or dispute about Mr. Taylor's performance, his workplace conduct, or his employment at Stanford at the time the challenged ESPN reports were published.  Thus, for purposes of addressing defendants' motion to dismiss, the Court proceeds on the hypothesis that Mr. Taylor is not a public figure for all purposes or a limited purpose, and that the "actual malice" standard does not apply.

### 2.    Falsity

"The sine qua non of recovery for defamation is the existence of falsehood."  *Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 695 (2012) (citation modified; citation omitted).  To survive a motion to dismiss, a plaintiff claiming defamation must establish that the challenged statements are "reasonably capable of sustaining a defamatory meaning."  *See Knievel*, 393 F.3d at 1073

United States District Court
Northern District of California

(citation omitted).  "The question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact."  *Summit Bank*, 204 Cal. App. 4th at 696 (citation modified; citation omitted).  "Whether a statement declares or implies a provably false assertion of fact is a question of law for the court to decide, unless the statement is susceptible of both an innocent and a libelous meaning, in which case the jury must decide how the statement was understood."  *McGarry*, 154 Cal. App. 4th at 113 (citation modified; citation omitted); *see also Summit Bank*, 206 Cal. App. 4th at 696 ("The crucial question of whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court.  Only once the court has determined that a statement is reasonably susceptible to such a defamatory interpretation does it become a question for the trier of fact whether or not it was so understood.") (citation modified; citations omitted).

"Because the challenged speech must be a statement of fact, the threshold question in every defamation suit is whether a reasonable factfinder could conclude that the contested statement implies an assertion of objective fact."  *Herring Networks*, 8 F.4th at 1157 (citation modified; citation omitted).  "If the answer is no, the claim is foreclosed by the First Amendment."  *Id.* ( citation omitted).  "Although defamation is primarily governed by state law, the First Amendment safeguards for freedom of speech and press limit state law."  *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995).  "The scope of constitutional protection extends to statements of opinion on matters of public concern that do not contain or imply a provable factual assertion."  *Id*.  In resolving this threshold question, the Ninth Circuit applies a three-factor test: "(1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates that impression, and (3) whether the statement in question is susceptible of being proved true or false."  *Herring Networks*, 8 F.4th at 1157 (citation modified; citation omitted); *see also Underwager*, 69 F.3d at 366-67.

a.   **Mr. Wetzel's March 22, 2025 article**

Defendants argue that Mr. Wetzel's March 22, 2025 article is a protected statement of opinion by a sports analyst.  *See* Dkt. No. 11 at ECF 27-28.  At the motion hearing, Mr. Taylor

17

clarified that he is not challenging any particular statement in Mr. Wetzel's March 22, 2025 article as an actionable false statement of fact. *See* Dkt. No. 36. Indeed, Mr. Wetzel's article does not purport to be original reporting regarding Mr. Taylor or the workplace investigations. Rather, the informal tenor of, and conversational language used in, Mr. Wetzel's article demonstrate that he is expressing his personal subjective viewpoints, which cannot be proved true or false, about the workplace investigations and their potential implication for Stanford's football program generally. *See* Dkt. No. 1, Ex. E. Mr. Wetzel's article is a nonactionable statement of opinion protected by the First Amendment, and any claim of defamation based on that article is foreclosed.

### b.    Remaining articles

As for the remaining articles in question—the March 19, 2025 article, Ms. Thai's Instagram post, the March 25, 2025 article, and the April 16, 2025 article (*see* Dkt. No. 1, Exs. A, B, F, G)—there appears to be no disagreement that the challenged statements in those articles are assertions of fact. The parties principally dispute the alleged falsity of the statements at issue. Mr. Taylor contends that the statements are provably false. Defendants maintain that the statements are substantially true.

In determining whether a statement declares or implies a provably false assertion of fact, courts apply a "totality of the circumstances" test and examine "what is explicitly stated as well as what insinuation and implication can be reasonably drawn from the communication." *Issa v. Applegate*, 31 Cal. App. 5th 689, 703 (2019) (citation modified; citations omitted); *see also Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 385 (2004) (same totality of the circumstances test for determining whether a statement is actionable fact or nonactionable opinion is used to determine whether the statement in question communicates or implies a provably false statement of fact). Under this test, courts first look to the words of the statement itself. *Issa,* 31 Cal. App. 5th at 703. "For words to be defamatory, they must be understood in a defamatory sense." *Id*. (citation modified; citation omitted). "Next, the context in which the statement was made must be considered." *Id*. (citation omitted). "The defamatory statement must specifically refer to, or be 'of and concerning,' the plaintiff." *Id*. at 702 (citation omitted).

"Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of

United States District Court
Northern District of California

the libelous charge be justified." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (citation modified; citation omitted).  Thus, "it is not the literal truth or falsity of each word or detail used in a statement which determines whether or not it is defamatory; rather, the determinative question is whether the 'gist or sting' of the statement is true or false, benign or defamatory, in substance." *Issa*, 31 Cal. App. 5th at 702 (citation modified; citation omitted).  The law does not require a defendant to "justify the literal truth of every word of the allegedly defamatory content, nor must [courts] parse each word written to determine its truthfulness." *Summit Bank*, 206 Cal. App. 4th at 697 (citation modified; citation omitted).  "It is sufficient if the defendant proves true the substance of the charge, irrespective of slight inaccuracy in the details, so long as the imputation is substantially true so as to justify the 'gist or sting' of the remark." *Id*. (citation modified; citations omitted).  "Where an imputation is substantially true so as to justify the 'gist or sting' of the remark, the truth defense is established." *Id*. (citation omitted).

At the time he filed his complaint in this action, Mr. Taylor did not have the reports of the workplace investigations conducted in 2023 and 2024. *See* Dkt. No. 1 ¶ 27.  As discussed above, the 2023 and 2024 workplace investigation reports properly may be considered under the incorporation-by-reference doctrine and copies of those reports have been provided to the Court and to counsel for Mr. Taylor in connection with defendants' motion to dismiss.

Ms. Patterson's 2023 workplace investigation report indicates that her findings are based on 30 interviews conducted and a review of documents. *See* Dkt. No. 13, Ex. 2; Dkt. No. 15-5 at ECF 2 n.2.  Ms. Patterson's report includes four findings.  She found "insufficient evidence" to support the allegation that Mr. Taylor asked to replace an administrator based on her gender. *See* Dkt. No. 13, Ex. 2; Dkt. No. 15-5 at ECF 3.  However, Ms. Patterson also found that Mr. Taylor "made inappropriate comments to [a female staff member] about her appearance, smell, and interest in football"; that "the current culture of the Football Program, which is set by the Football Leadership," is not only "not welcoming to women," but also "not welcoming to anyone, regardless of gender, who cannot dedicate unrestricted time to the program"; and that "in several interactions with staff"—one of which involved a male staff member and three of which involved female staff members—Mr. Taylor "made belittling comments" and "expressed inappropriate

19

anger and frustration (yelling and outsized reactions)." *See* Dkt. No. 13, Ex. 2; Dkt. No. 15-5 at ECF 5, 6, 9-10. Ms. Patterson's four findings were included in the December 2023 letter to Mr. Taylor, summarizing the 2023 workplace investigation's findings and warning him that he could be terminated for additional similar behavior. *See* Dkt. No. 1 ¶ 28; Dkt. No. 13, Ex. 1; Dkt. No. 15-4.

In the report of his 2024 workplace investigation, Mr. O'Brien states that this second investigation was initiated following "new verbal and written complaints" by two people. Dkt. No. 13, Ex. 3; Dkt. No. 15-6 at ECF 2. Mr. O'Brien found that Mr. Taylor's treatment of a compliance officer "was inappropriate, discriminatory on the basis of her sex," and had "a significant negative impact on her." Dkt. No. 13, Ex. 2; Dkt. No. 15-6 at ECF 4. Mr. O'Brien further found that Mr. Taylor "retaliated against [the compliance officer] by seeking her removal from her assigned duties" after she raised concerns about NCAA rules violations. Dkt. No. 13, Ex. 2; Dkt. No. 15-6 at ECF 6. Noting that he reviewed the 2023 workplace investigation materials, Mr. O'Brien found that Mr. Taylor's conduct was "a continuation of the type of conduct that resulted in the" warning letter issued to Mr. Taylor in December 2023. Dkt. No. 13, Ex. 3; Dkt. No. 15-6 at ECF 2-3, 5. Additionally, Mr. O'Brien found that "[u]nder Coach Taylor's leadership, the football program has disregarded or simply not followed NCAA rules that they have been repeatedly and consistently educated on by the Compliance Office, and as a result, he is not sufficiently promoting an atmosphere of compliance or effectively monitoring his staff." Dkt. No. 13, Ex. 3; Dkt. No. 15-6 at ECF 6.

Based on his complaint and, as discussed at the motion hearing, Mr. Taylor claims that nine statements[6] are false and defamatory. Four of the alleged defamatory statements are found in the March 19, 2025 article and Ms. Thai's Instagram post:

(1) the headline: "Reports find Stanford's Taylor bullied, belittled female staffers." (*see* Dkt. No. 1 ¶ 52 & Exs. A, B);

(2) the photo caption in the March 19, 2025 article and on Ms. Thai's Instagram post:

---

[6] Although Mr. Taylor contends that the statement appearing in ¶ 52.a. of his complaint is false, at the motion hearing he clarified that this statement is not the focus of his defamation claim.

United States District Court
Northern District of California

"Stanford head coach Troy Taylor remains on the job after two investigations found he had bullied and belittled athletics staff, especially women, and made inappropriate comments about one woman's appearance." (*see* Dkt. No. 1 ¶¶ 52, 53 & Exs. A, B);

(3) "The investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks, the reports said." (*see* Dkt. No. 1 ¶ 52.b. & Ex. A); and

(4) "Both investigations determined that Taylor's treatment of employees, particularly of women, was inconsistent with Stanford's standards." (*see* Dkt. No. 1 ¶ 52.c. & Ex. A).

Two of the alleged defamatory statements are found in the March 25, 2025 article:

(5) "Stanford fired football coach Troy Taylor, the school announced Tuesday.  The decision comes a week after ESPN reported that two outside firms had found Taylor bullied and belittled female athletic staffers, sought to have an NCAA compliance officer removed after she warned him of rules violations and repeatedly made 'inappropriate' comments to another woman about her appearance."  (*see* Dkt. No. 1 ¶ 55.a. & Ex. F); and

(6) "According to documents obtained by ESPN, the investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks, the reports said." (*see* Dkt. No. 1 ¶ 55.b. & Ex. F).

Three of the alleged defamatory statements are found in the April 16, 2025 article:

(7)  Ex-Stanford coach Troy Taylor takes issue with investigation." (Dkt. No. 1 ¶ 56 & Ex. G)[7];

(8) "Three of the allegations regarding belittling and inappropriate behavior toward multiple women were deemed to have merit." (*see* Dkt. No. 1 ¶ 56 & Ex. G); and

(9) "The investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks, the reports said." (*see* Dkt. No. 1 ¶ 56 & Ex. G).

As discussed above, Mr. Taylor challenges these statements as they relate to defendants' reporting of Ms. Patterson's 2023 workplace investigation.  He does not take issue with these statements insofar as they relate to the reporting of Mr. O'Brien's 2024 workplace investigation.

Neither Mr. Taylor nor defendants have addressed the alleged defamatory statements on a statement-by-statement basis.  While Mr. Taylor agrees that several of the statements are similar

---

[7] Although it is not clear that Mr. Taylor challenges the April 16, 2025 article headline as defamatory, the Court addresses his allegations (*see* Dkt. No. 1 ¶ 46) that another aspect of defendants' reporting in that article is misleading.

21

and may be addressed as a group in some fashion, at the motion hearing he stated that he did not agree with the way in which defendants grouped the challenged statements in their arguments. For this reason, the Court separately addresses each statement at issue below.

### i. March 19, 2025 article headline: "Reports find Stanford's Taylor bullied, belittled female staffers."

Mr. Taylor argues that the March 19, 2025 article headline is false because it suggests that both workplace investigations found that he "bullied" and "belittled female staffers." The headline of the March 19, 2025 article uses the plural form of the word "Reports," referring collectively to the reports of the 2023 and 2024 investigations. While Mr. Taylor objects to defendants' suggestion that the two workplace investigations be "[t]aken together" (*see* Dkt. No. 11 at ECF 20; Dkt. No. 29 at ECF 21), he cites no authority for the proposition that defendants are required to report about each investigation separately, or that the article's headline must disaggregate the findings from each investigation. In context, the March 19, 2025 article reports on both workplace investigations. The headline referring to both reports is a substantially accurate summary of the March 19, 2025 article's contents and is not reasonably capable of a defamatory meaning in the context in which the headline appears.

Mr. Taylor's principal contention is that defendants' reporting falsely suggests that the 2023 workplace investigation made certain findings that, he maintains, were not made in that first investigation. While Mr. Taylor recognizes that the 2023 investigation found that he engaged in "belittling" behavior and that he made "inappropriate comments," he argues that the investigation's findings about "belittling" did not include a discriminatory component based on gender and that the "inappropriate comments' were not remotely 'bullying' or 'aggressive' (nor described as such in the report)." Dkt. No. 29 at ECF 23. As Mr. Taylor acknowledged at the motion hearing, the 2023 investigation found that he engaged in belittling conduct toward staff in four instances, one of which involved a male and three of which involved female staff. *See* Dkt. No. 13, Exs. 1, 2; Dkt. No. 15-5 at ECF 9-10; *see also* Dkt. No. 36. The March 19, 2025 article correctly reports that Ms. Patterson found that Mr. Taylor made "belittling comments" and "expressed inappropriate anger and frustration" with staff. *See* Dkt. No. 1, Ex. A at ECF 32; *see*

United States District Court
Northern District of California

*also* Dkt. No. 13, Exs. 1, 2; Dkt. No. 15-4 at ECF 1; Dkt. No. 15-5 at ECF 9-10. While Ms. Patterson did not use the words "bully" or "aggressive" in this finding to describe Mr. Taylor's behavior, in the supporting narrative, Ms. Patterson found credible descriptions of Mr. Taylor's conduct toward a female staff member as "super aggressive," and as "shut[ting] her down and dismiss[ing] her." *See* Dkt. No. 15-5 at ECF 10, 11. The March 19, 2025 headline fairly summarizes the substance of the 2023 workplace investigation's findings regarding Mr. Taylor's conduct toward female staff.

Mr. Taylor maintains that the 2023 investigation's finding about "belittling" conduct did not include a "discriminatory component" based on gender, and that defendants' reporting falsely implies that he targeted women and harbored discriminatory animus based on gender. *See* Dkt. No. 29 at ECF 23. He points out that the 2023 investigation found that "'the current culture is not welcoming to anyone, regardless of gender, who cannot dedicate unrestricted time to the program.'" *See id*. at ECF 22-23; Dkt. No. 13, Exs. 1, 2; Dkt. No. 15-5 at ECF 6. Mr. Taylor argues that, contrary to defendants' reporting about the workplace investigations, this 2023 investigation finding does not indicate any gender-based misconduct, but rather reflects his desire to have staff dedicate themselves to their jobs. *See* Dkt. No. 29 at ECF 23. However, in that same portion of her report, Ms. Patterson also expressly found that "the current culture of the Football Program, which is set by the Football Leadership, is not welcoming to women." Dkt. No. 13, Ex. 2; Dkt. No. 15-5 at ECF 6. The 2023 investigation also found that Mr. Taylor made "inappropriate comments" to a female staff member "about her appearance, smell and interest in football." *See id*., Ex. 1 at ECF 3, Ex. 2; Dkt. No. 15-5 at ECF 5. As discussed above, Ms. Patterson further found that Mr. Taylor "expressed inappropriate anger and frustration and has made belittling comments on at least four separate occasions," three of which involved female staff. *See id*., Ex. 2; Dkt. No. 15-5 at ECF 9-10. Additionally, the March 19, 2025 article accurately reports that Mr. O'Brien's 2024 workplace investigation found Mr. Taylor's behavior to be a "continuation of the type of conduct" that Mr. Taylor was warned about following the first investigation. *See* Dkt. No. 1, Ex. A at ECF 33; *see also id*. ¶ 28; Dkt. No. 13, Ex. 3; Dkt. No. 15-6 at ECF 5. The salient point of defendants' reporting is that the 2023 investigation found that Mr.

United States District Court
Northern District of California

Taylor engaged in misconduct toward female staff in the workplace.  That is a substantially true characterization of the 2023 investigation's and 2024 investigation's findings.

For these reasons, the March 19, 2025 article headline is not defamatory as a matter of law.

> **ii.    March 19, 2025 article photo caption and Instagram Post: "Stanford head coach Troy Taylor remains on the job after two investigations found he had bullied and belittled athletics staff, especially women, and made inappropriate comments about one woman's appearance."**

Similar to the article headline, Mr. Taylor challenges the portion of this statement that "two investigations found he had bullied and belittled athletics staff, especially women . . .."[8]  For the reasons discussed above, although the 2023 workplace investigation findings did not use the specific words "bully" or "aggressive" to describe Mr. Taylor's behavior, the March 19, 2025 photo caption and Instagram post fairly summarize the substance, not only of the 2024 workplace investigation's findings, but also of the 2023 workplace investigation's findings regarding Mr. Taylor's conduct toward female staff.  This challenged statement is not defamatory as a matter of law.

> **iii.    March 19, 2025 article:  "The investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks, the reports said."**

Mr. Taylor argues that this statement is false because it suggests that the 2023 workplace investigation began "after multiple employees filed complaints" regarding "hostile and aggressive behavior, as well as personal attacks . . .."  Mr. Taylor maintains that the 2023 investigation began after one individual made a single complaint that Mr. Taylor wanted to replace the football administrator because she is a woman—an allegation for which he points out the first investigation found "insufficient evidence."  *See* Dkt. No. 29 at ECF 12; *see also* Dkt. No. 1 ¶ 35.

The challenged statement uses the plural "investigations," referring to both the 2023 and 2024 investigations together.  Mr. Taylor cites no authority for the proposition that defendants are

---

[8] Mr. Taylor does not appear to challenge the portion of this statement that he was found to have made "inappropriate comments about one woman's appearance."  *See* Dkt. No. 29 at ECF 23 & n.9.

required to report about or describe each investigation separately, or to correlate specific complaints with specific investigations. In context, the March 19, 2025 article was written about eight months after the completion of the 2024 investigation and about fifteen months after the 2023 investigation concluded—by which time multiple employees had complained about Mr. Taylor's conduct, as reflected in the reports of the workplace investigations themselves. *See* Dkt. No. 13, Exs. 2, 3; Dkt. No. 15-5; Dkt. No. 15-6. As defendants point out, the 2023 investigation report indicates that Stanford retained Ms. Patterson after more than one person raised concerns about Mr. Taylor (*see* Dkt. No. 13, Ex. 2; Dkt. No. 15-5 at ECF 2), and there is no dispute that the scope of Ms. Patterson's review was not limited to the initial complaint regarding the football administrator, but rather encompassed an assessment of "the culture of the football program" and "a review of various allegations related to whether DAPER employees are mistreated or disrespected in general and/or due to gender." *See* Dkt. No. 1 ¶ 28; *see also* Dkt. No. 13, Exs. 1, 2; Dkt. No. 15-4 at ECF 2; Dkt. No. 15-5. In any event, when the challenged statement about how the investigations began is read in the context of the entire article, the March 19, 2025 article makes clear that the 2023 investigation started with one complaint: "Stanford *first* looked into [Mr. Taylor's] conduct in May 2023 . . . when a senior athletic department staffer raised potential gender discrimination issues with Muir, the athletic director." Dkt 1, Ex. A at ECF 32 (emphasis added). Additionally, as discussed above, Ms. Patterson found that Mr. Taylor made "belittling comments" and "expressed inappropriate anger and frustration (i.e., yelling and outsized reactions)" toward staff, and also found credible descriptions of Mr. Taylor's conduct toward a female staff member as "super aggressive," and as "shut[ting] her down and dismiss[ing] her." *See* Dkt. No. 13, Exs. 1, 2; Dkt. No. 15-4 at ECF 1; Dkt. No. 15-5 at ECF 9-10, 11. The gist of the challenged statement therefore is substantially true. This statement is not defamatory as a matter of law.

                    iv.        **March 19, 2025 article: "Both investigations determined that Taylor's treatment of employees, particularly of women, was inconsistent with Stanford's standards."**

      Mr. Taylor appears to contend that this statement is defamatory because it falsely suggests

United States District Court
Northern District of California

that the 2023 workplace investigation found that he engaged in discriminatory behavior targeted at women, inconsistent with Stanford's standards. *See* Dkt. No. 29 at ECF 6, 12. For the reasons discussed above, defendants' reporting presents a substantially true summary, not only of the 2024 investigation, but also of the 2023 investigation, which found that Mr. Taylor engaged in misconduct toward female staff in the workplace. While Mr. Taylor maintains that the challenged statement falsely reports that the 2023 investigation found his conduct to be inconsistent with Stanford's standards (*see, e.g.,* Dkt. No. 1 ¶2), following the first investigation Mr. Taylor received a letter warning him that additional similar behavior could result in his termination. *See* Dkt. No. 13, Ex. 1; Dkt. No. 15-4. Additionally, Mr. O'Brien's 2024 workplace investigation found that Mr. Taylor's conduct was inconsistent with Stanford's standards, and a "continuation of the type of conduct" that led to the warning letter issued after the first investigation. *See* Dkt. No. 15-6 at ECF 4, 5.

The gist of the challenged statement that the workplace investigations found that Mr. Taylor engaged in discriminatory behavior targeted at women, inconsistent with Stanford's standards, is substantially true. This statement is not defamatory as a matter of law.

> **v.    March 25, 2025 article: "Stanford fired football coach Troy Taylor, the school announced Tuesday. The decision comes a week after ESPN reported that two outside firms had found Taylor bullied and belittled female athletic staffers, sought to have an NCAA compliance officer removed after she warned him of rules violations and repeatedly made 'inappropriate' comments to another woman about her appearance."**

As discussed above, Mr. Taylor does not take issue with defendants' reporting regarding the 2024 workplace investigation, in which Mr. O'Brien concluded that Mr. Taylor retaliated against a compliance officer by "seeking her removal from her assigned duties" after she raised concerns about NCAA rules violations. *See* Dkt. No. 1, Exs. A, C, F; Dkt. No. 13, Ex. 3; Dkt. No. 15-6. Nor does Mr. Taylor appear to challenge the statement that he was found to have made "inappropriate comments" to a female staff member. *See* Dkt. No. 29 at ECF 23 & n.9. It thus appears that Mr. Taylor challenges only the portion of this statement that "two outside firms had found [he] bullied and belittled female athletic staffers . . ." on the ground that the 2023 workplace investigation made no findings that he "bullied" female staff. For the reasons discussed above,

although Ms. Patterson did not use the word "bully" to describe Mr. Taylor's behavior, she found credible reports of Mr. Taylor's conduct toward a female staff member as "super aggressive," and as "shut[ting] her down and dismiss[ing] her." *See* Dkt. No. 15-5 at ECF 10, 11.  This challenged statement in the March 25, 2025 article is substantially true and is not defamatory as a matter of law.

> vi.     **March 25, 2025 article:  "According to documents obtained by ESPN, the investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks, the reports said."**

As with similar statements discussed above, Mr. Taylor contends that this statement falsely suggests that the 2023 workplace investigation began "after multiple employees filed complaints" regarding "hostile and aggressive behavior, as well as personal attacks."  For the reasons discussed above, this statement is not defamatory as a matter of law.

> vii.     **April 16, 2025 article:  "Ex-Stanford coach Troy Taylor takes issue with investigation."**

The April 16, 2025 article in question discusses Mr. Taylor's public response regarding his termination, and reports that he "tak[es] issue with the findings of two separate workplace investigations conducted during his two-year tenure." *See* Dkt. No. 1 ¶¶ 46, 56 & Ex. G.  Mr. Taylor does not appear to contend that the April 16, 2025 headline (above) is a false statement, and he does not appear to challenge the accuracy of the headline itself.  Nor could he, as the statement that he "takes issue with investigation" is undisputedly true.  Rather, Mr. Taylor appears to allege that the article is misleading in that it reported that he "did not acknowledge any wrongdoing," but also stated that Mr. Taylor "'said he had not obtained the text of the two investigation reports.'" *See* Dkt. No. 1 ¶ 46 (quoting Ex. G at ECF 53.)  In context, the article reported, "Taylor did not acknowledge any wrongdoing in his statement, although he said he had not obtained the text of the two investigation reports in which multiple complainants were quoted." Dkt. No. 1, Ex. G at ECF 53.  Mr. Taylor contends that "[i]n this way, [d]efendants sought to elevate the credibility of their false reporting over the credibility of [his] denials." *Id*. ¶ 46; *see also id*. ¶ 66.  The statement that Mr. Taylor "did not acknowledge any wrongdoing" is

27

undisputedly true. Additionally, the statement that Mr. Taylor "said he had not obtained the text of the two investigation reports in which multiple complainants were quoted" is also true. Indeed, in his complaint and in his arguments before this Court, Mr. Taylor reiterated that he has not obtained the full reports of the 2023 and 2024 workplace investigations or complete information about them. *See* Dkt. No. 1 ¶¶ 27, 46; Dkt. No. 29 at ECF 17. Defendants' reporting is not defamatory simply because Mr. Taylor did not have complete information about the workplace investigations or access to the full reports, and defendants accurately reported that Mr. Taylor had not obtained those reports and that multiple complaints are quoted in them. That statement in the April 16, 2025 article is not defamatory as a matter of law.

    **viii. April 16, 2025 article: "Three of the allegations regarding belittling and inappropriate behavior toward multiple women were deemed to have merit."**

    Mr. Taylor contends that this statement is false because he maintains that the 2023 investigation did not find that he "discriminated against even one female staff member, let alone 'multiple women.'" Dkt. No. 29 at ECF 16. The challenged statement appears in a paragraph of the April 16, 2025 article regarding the four allegations that Ms. Patterson was asked to investigate:

> While the investigation was initially launched in response to a single complainant who alleged gender bias and "a culture problem in football," the investigation ultimately included interviews with at least 20 Stanford athletic department staffers regarding four allegations against Taylor. Three of the allegations regarding belittling and inappropriate behavior toward multiple women were deemed to have merit. The investigator did find "insufficient evidence" regarding the original complaint.

Dkt. No. 1, Ex. G. In context, this passage describes Ms. Patterson's four findings in the 2023 workplace investigation. As discussed above, and as defendants accurately reported, Ms. Patterson found "insufficient evidence" to substantiate the allegation that Mr. Taylor wanted to replace the football administrator because of her gender. In her remaining three findings, Ms. Patterson found that Mr. Taylor made "inappropriate comments" to a female staff member; that "Football Leadership" cultivated a "culture" that is "not welcoming to women"; and that Mr. Taylor made "belittling comments" and "expressed inappropriate anger and frustration" to staff on

28

at least four occasions, three of which involved women.  *See* Dkt. No. 13, Ex. 2; Dkt. No. 15-5 at ECF 9-10.  The April 16, 2025 article's statement that Ms. Patterson found sufficient evidence to substantiate three of the four allegations "regarding belittling and inappropriate behavior toward multiple women" is a substantially true summary of the 2023 investigation's findings.  The April 16, 2025 article's statement is not defamatory as a matter of law.

>    ix.    **April 16, 2025 article:  "The investigations began after multiple employees filed complaints against Taylor for what they called hostile and aggressive behavior, as well as personal attacks, the reports said."**

As with similar statements discussed above, Mr. Taylor contends that this statement falsely suggests that the 2023 workplace investigation began "after multiple employees filed complaints" regarding "hostile and aggressive behavior, as well as personal attacks."  For the reasons discussed above, this statement is not defamatory as a matter of law.

\* \* \*

As none of the statements challenged by Mr. Taylor are defamatory as a matter of law, Mr. Taylor's complaint fails to state a plausible claim for defamation.  Defendants' motion to dismiss the complaint is granted.

### D.    Leave to Amend

A court should "freely give leave [to amend a complaint] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "The decision of whether to grant leave to amend nevertheless remains within the discretion of the district court," which may deny leave to amend if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the party seeking amendment has acted in bad faith.  *Leadsinger, Inc. v. BMG Music Publ'g,* 512 F.3d 522, 532 (9th Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

In his opposition papers, Mr. Taylor did not request leave to amend, even though at the time of his briefing he had complete copies of the reports of the 2023 and 2024 workplace investigations.  *See generally* Dkt. No. 29.  At the motion hearing, Mr. Taylor stated that he would like an opportunity to amend his complaint, but he did not clearly describe the amendments he proposes to make.  Even if Mr. Taylor had done so, the Court is not persuaded that he could

United States District Court
Northern District of California

29

amend his complaint to remedy the main deficiency discussed above—namely, that the challenged statements are not defamatory as a matter of law. The record before the Court includes the complaint's allegations, the ESPN articles at issue (appended to the complaint), and the full reports of the 2023 and 2024 workplace investigations that are incorporated by reference in the complaint. In the circumstances presented here, even under Rule 15(a)'s liberal policy favoring amendment, *see Foman*, 371 U.S. at 182, Mr. Taylor has identified no justification for amendment, and permitting amendment with respect to the challenged statements would be futile, *see Herring Networks*, 8 F.4th at 1160-61 (affirming dismissal without leave to amend on grounds that amendment would be futile).

## IV.     ANTI-SLAPP MOTION TO STRIKE

"Under California's anti-SLAPP statute, a defendant may bring a special motion to strike a cause of action arising from constitutionally protected speech or petitioning activity." *Barry v. State Bar of Cal.*, 2 Cal.5th 318, 320 (2017) (citing Cal. C.C.P. § 425.16(b)(1)). The anti–SLAPP statute is designed to allow the early dismissal of meritless lawsuits aimed at chilling expression through costly, time-consuming litigation. *Verizon Delaware, Inc. v. Covad Comms. Co.,* 377 F.3d 1081, 1090 (9th Cir.2004).

Courts evaluate an anti-SLAPP motion in two steps. *Barry*, 2 Cal.5th at 321. First, "'the moving defendant must make a prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech.'" *Herring Networks*, 8 F.4th at 1155 (quoting *Makaeff*, 715 F.3d at 261); *see also Barry*, 2 Cal.5th at 321 (same). Second, "[i]f the defendant satisfies this requirement, '[t]he burden then shifts to the plaintiff to establish a reasonable probability that it will prevail on its claim in order for that claim to survive dismissal.'" *Id.* (quoting *Makaeff*, 715 F.3d at 261); *see also Barry*, 2 Cal.5th at 321 (same). "Unless the plaintiff establishes a probability of prevailing on the claim, the court must grant the motion and ordinarily must also award the defendant its attorney's fees and costs." *Barry*, 2 Cal.5th at 320 (citing Cal. C.C.P. § 425.16(b)(1) & (c)(1)).

As confirmed at the motion hearing (*see* Dkt. No. 36), Mr. Taylor does not dispute that the challenged statements arise from activity protected under the First Amendment. Accordingly, the

30

first step of the anti-SLAPP analysis is satisfied.

As confirmed at the motion hearing, the parties also agree that the Rule 12(b)(6) standard applies at the second step of the anti-SLAPP analysis. *See* Dkt. No. 36. For the reasons discussed above, Mr. Taylor cannot show a probability of success on the merits of his defamation claim because he fails to state a claim for defamation under the Rule 12(b)(6) pleading standard. *Planned Parenthood Fed. of Am. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018) (plaintiff must satisfy the Rule 12(b)(6) pleading standard). The Ninth Circuit has cautioned in the context of anti-SLAPP motions that procedural state laws should not be used in federal court "if to do so would result in a direct collision with a Federal Rule of Civil Procedure" and that "granting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment." *Verizon Delaware*, 377 F.3d at 1091. However, for the reasons discussed above, even under Rule 15(a)'s liberal policy favoring amendment, Mr. Taylor has not demonstrated a basis for amendment. *Cf. Shande v. Zoox, Inc.*, No. 22-cv-05821-BLF, 2023 WL 5211628, at *7 (N.D. Cal. Aug. 14, 2023) (deferring decision on anti-SLAPP motion pending the filing of an amended pleading where operative complaint contained "ambiguity").

Accordingly, the Court grants defendants' motion to strike the complaint without leave to amend.

## V.   CONCLUSION

Based on the foregoing, the Court grants defendants' Rule 12(b)(6) motion to dismiss the complaint and their motion to strike the complaint pursuant to California's anti-SLAPP statute, without leave to amend. If defendants seek an award of attorneys' fees and costs pursuant to the anti-SLAPP statute, Cal. C.C.P. § 425.16(c)(1), they must file a noticed motion for attorneys' fees and costs in compliance with Civil Local Rule 54-5 within the next 60 days, unless the parties stipulate to a different filing date. Any such motion must include information sufficient for the Court to determine that the fees and costs claimed are reasonable. Prior to the filing of any such motion, the parties shall confer for the purpose of resolving any disputes with respect to such motion. As an alternative to a noticed motion, the parties may stipulate to an amount of attorneys'

United States District Court
Northern District of California

United States District Court
Northern District of California

fees and/or costs, and so advise the Court.

By **March 31, 2026**, the parties shall file a joint status report advising whether the Court should defer entering judgment on this order, pending the resolution of a fees motion (if any) that defendants file.

**IT IS SO ORDERED.**

Dated: March 17, 2026

Virginia K. DeMarchi
United States Magistrate Judge